**Peter BARTOK, Plaintiff,**

v.

**BOOSEY & HAWKES, INC., and Benjamin Suchoff, as Trustee of the Estate of Bela Bartok, Defendants.**

**No. 73 Civ. 4570.**

United States District Court, S. D. New York.

Sept. 26, 1974.

---

3. Army Regulation 145–1, Paragraph 3–25.

Herbert (Peter A. Orenstein, Arrow, Silverman & Parcher, P. C., New York City) for plaintiff.

Maxwell Okun (Fishbein & Okun, New York City) for defendants, Boosey & Hawkes.

Shirley A. Thau (Wolf, Popper, Ross, Wolf & Jones, New York City) for defendant Suchoff.

Irwin Karp, New York City, The Authors League of America, Inc., amicus curiae.

## OPINION

OWEN, District Judge.

These are cross-motions by Peter Bartok, a son of composer Bela Bartok, and Boosey & Hawkes, Bela Bartok's publisher. Twenty-eight years having passed since Boosey originally copyrighted Bartok's *Concerto for Orchestra*, each seeks, by summary judgment, to secure the right of renewal of said copyright for the second twenty-eight year period provided under Tit. 17 U.S.C. § 24.

In 1943, Bartok, 62 years of age, was a sick and somewhat embittered man, the despair both of his doctors and friends. Neglect of his music was a source of aggravation to him, as were his impecunious circumstances. But on top of this he was suffering from the leukemia which would claim his life a little more than two years later. By the summer of 1943, he was confined to a small New York Hospital room, and it was there that one day arrived an unannounced caller, Serge Koussevitzky. The famous conductor had come alone, and accepting the only chair, drew it close to the bed and began at once to explain his mission. Aware that the fiercely proud composer would accept neither charity nor an assignment he did not feel able to undertake, the conductor did not "offer" a commission to the desperately ill Bartok. Instead, lying as matter-of-factly as he could, he reported that he was acting as a courier for the Koussevitzky Foundation (set up as a memorial to his late wife Natalie) and that he was bound to leave a check for $500 with Bartok whether or not any new piece would be forthcoming. This figure, he added, was only half of what had been set aside. Another $500 would be paid upon receipt of the score it was hoped that Bartok could write. But the first $500 was his irrevocably.

Orthodox medicine has no explanation for the speedy, if temporary, recuperation that ensued. The grimmest prognoses would be confirmed soon enough,

but after Koussevitzky's visit Bartok rallied so astonishingly that the incredulous specialists authorized his discharge from the hospital. The composer then went south, to Asheville, North Carolina, and it was there, between August 15 and October 8, 1943 that he wrote the *Concerto for Orchestra*. The first performances took place on December 1 and 2, 1944, in Symphony Hall, Boston, with Koussevitzky conducting the Boston Symphony. The work was so successful that it was repeated on December 29 and 30 in Boston, and on January 10 and 13, 1945 at Carnegie Hall in New York. Since that time this masterpiece has become a repertory staple not only of the Boston Symphony but of orchestras the world over.[1]

Upon completion of the *Concerto* in 1943, Bartok assigned his rights in the work to Boosey pursuant to their 1939 publishing contract. Boosey prepared the "parts" for the orchestra and set about printing the "full" score. However, wartime conditions—the work was to be published in England—and a rewriting of some of the music done by Bartok after the premiere, caused delays and Bartok was still receiving and correcting printer's proof as late as June 1945, three months before his death. The *Concerto* was consequently not published[2] and copyrighted by Boosey until March 20, 1946, some six months after he died.[3]

The first period of copyright expiring in March 1974, both claimants to the renewal filed timely applications with the United States Register of Copyrights.

The controlling statute in this case is Title 17 U.S.C. § 24, which provides in relevant part as follows:

The copyright secured by this title shall endure for twenty-eight years from the date of first publication . . . *Provided,* That in the case of any posthumous work . . . the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in the case of any other copyrighted work . . . the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, . . . shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: . . .

Each claimant contends § 24 mandates the award of the renewal. Boosey, the "proprietor" of the original copyright, contends that the work is a "posthumous" work. Peter Bartok, contending the work is not "posthumous", claims the renewal as one of the "children of the author, . . ." The Register of Copyrights permitted the filing of both renewals expressly declining to adjudicate as between them. All parties agree that this is a case of first impression.[4]

The determination of the issue thus raised requires, as I see it, consideration of (1) the purpose of Congress in providing for the renewal period in § 24, and (2) the meaning of "posthumous" therein.

1. Adapted from a program note by Harry Neville, Tanglewood, 1974.

2. "Publish" in the field of music means more than printing copies of a score. It occurs " . . . when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public . . ." (footnotes omitted). Nimmer on Copyrights § 49.

3. Under the contract Boosey was required to publish within six months of receiving the manuscript. There is no evidence that Bartok sought to enforce this requirement, nor is there the slightest suggestion that Boosey delayed publishing of this work in order to cause it to be "posthumous", which is the basis of its claim for the right of renewal.

4. Nimmer on Copyrights in § 114.1, is in accord.

The rationale of the renewal period in § 24 is clear. On March 27, 1908, at the Congressional Committee Hearings before the Joint Committee on Patents, the following colloquy took place between the Chairman and William Allen Jenner of New York on the subject of whether to extend the author's term of copyright for an additional fourteen years:

*The Chairman:* I would like to ask you a question. Would not the publisher, if a third term were given, make a contract with the author stipulating that not only was he to have control of the publication for the first twenty-eight years, but that he should control it, and the right to publish it, under the original contract, for the fourteen-year extension period and if we give another extension of fourteen years, then for the second fourteen-year period?

*Mr. Jenner:* It is never done, and I have some doubt about whether it legally could be done. But I should be glad to see that so provided for that it could not be done under the law.

*Representative Law:* Then put it in the bill itself.

*Mr. Jenner:* Put it in the bill itself, and say that it cannot be done, so that the author is certain to have that extension as a provision for his age or a provision for his widow and his children.

■ Thereafter, the Committee report on the 1909 Act stated, concerning the present twenty-eight year renewal as follows:

Your Committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum.

If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right. Rothenberg, Copyright Law, "Committee Report on 1909 Act", C. 1, Sec. 9 at 60 (Clark Boardman Co. 1956).

This Congressional purpose has been recognized by the Courts. See Harris v. Coca-Cola, 73 F.2d 370 (5th Cir. 1934) at 371:

The second period is intended, not as an incident of the first for the benefit of the then owner of the expiring copyright, but as a second recognition extended by the law to the author of the work that has proven permanently meritorious.

Thus far, I would be persuaded to conclude that son Peter (and his mother and brother[5]) is entitled to the renewal of the copyright of his father's *Concerto*.

Boosey's assertion that the work is a "posthumous" work entitling it to the renewal must now be considered.

The original meaning of the word "posthumous" was "a child born after its father's death." As thus defined, it obviously has no applicability to a piece of music, and Peter Bartok takes the position, not illogically, that regardless of the dictionary definition of "posthumous", discussed *infra*, it cannot possible apply to a musical work that was publicly performed a number of times by the Boston Symphony Orchestra in the composer's lifetime with the composer present, as well as being broadcast during his lifetime.

However, the word "posthumous", long used in the field of music, has in

---

5. They of course, share this statutory right with him. See § 24, *supra*. In that connection it is appropriate to note that under a 1949 agreement signed by son Peter, Bartok's widow, and the Estate, Boosey will pay royalties during the renewal period to the parties legally entitled thereto. Thus, irrespective of the outcome of this litigation, Bartok's widow, the sole beneficiary under Bartok's will, is protected. It is only son Peter and his brother who stand to gain hereby.

fact acquired a specific meaning. Nimmer on Copyright, § 114.1 acknowledges that "The accepted dictionary definition for 'posthumous' is . . . published after the death of its author . . . " Ringer, in her treatise, Renewal of Copyright, Copyright Office Study No. 31, p. 128 states: "The generally accepted definition of 'posthumous works' is one which is published subsequent to the death of its author."

In Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697 (2d Cir. 1941), the only judicial interpretation research discloses, Judge Learned Hand, in a dictum, utilizes the date of "publication"—necessarily after the author's death—to define "posthumous", the Court stated (p. 699):

> The first class provides for "posthumous" works, i.e. those on which the original copyright has been taken out by someone to whom the literary property passed before publication.

The Register of Copyrights, in the form it has long furnished to a copyright applicant, defines "posthumous" as a ". . . work first published and copyrighted after the death of the author." Significantly, Congress has continued to use the word "posthumous" without change in recent bills relating to the revision of the Copyright Act. Section 304 of the first Copyright Revision Bill (H.R. 2512) passed by the House on April 11, 1967, Section 304 of S. 543 introduced in the senate on January 22, 1969, and Section 304 of S. 1361 introduced in the Senate on March 26, 1973, all continue to provide that a "posthumous work" is one of the classes in which the renewal vests in the "proprietor".

In the face of this, I am constrained to conclude that *Concerto for Orchestra*, published after Bartok's death, is a "posthumous" work within the meaning of § 24. My conclusion is further supported by independent research which reveals that "posthumous" had the same meaning as much as 120 years ago, an exact parallel to the instant case being found in the compositions of Frederic Chopin.

Chopin died in 1849. A number of his works were published "posthumously" and are so designated on the scores themselves. See e.g. Frederic Chopin, Complete Works for the Pianoforte, G. Schirmer, 1894. His Rondo in C Major for two pianos, Op. 73, was published as a "posthumous" work in 1855, six years after his death. It was composed, however, in 1828, twenty-one years before his death, and was given its first performance in the Ressource, a concert hall in Warsaw, Poland sometime in or prior to 1830, nineteen years before his death.[6]

Given all the foregoing, I am bound to accord the word "posthumous" in § 24 the definition it has had in the field of music for over a century. I therefore declare that Bartok's *Concerto for Orchestra*, having been published after the death of its composer, is a "posthumous" work, within the meaning of Title 17 U.S.C. § 24, and consequently Boosey & Hawkes is entitled to the right of renewal of the copyright.

The motion for summary judgment of Boosey & Hawkes is granted and that of Peter Bartok is denied. Settle order on notice.

6. Chopin's Letters, Vienna House, pp. 39, 47; Chopin: His Life, Murdoch, MacMillan Co., 1935, pp. 50, 69, 393. As further examples, two of Chopin's short piano works, the waltz in F minor, Op. 69, No. 1, and the waltz in D flat, Op. 70, No. 3, published "posthumously" in 1855, were written in 1835 and 1829 respectively, and copies delivered in each case to the lady of whom Chopin was then enamored. Chopin: His Life, pp. 66, 73–4, 393; Grove's Dictionary of Music and Musicians. It is hardly likely that Chopin, a frequent performer of his own works in recital, did not on some occasion or occasions perform these works in public.