Peter BARTOK, Appellant,

v.

BOOSEY & HAWKES, INC., and Benjamin Suchoff, as Trustee of the Estate of Bela Bartok, Appellees.

No. 940, Docket 74–2592.

United States Court of Appeals,
Second Circuit.

Argued June 10, 1975.

Decided Sept. 26, 1975.

Peter A. Herbert, Orenstein, Arrow, Silverman & Parcher, New York City, for appellant.

Maxwell Okun, Fishbein & Okun, New York City, for appellee Boosey & Hawkes.

Shirley P. Thau, Wolf, Popper, Ross, Wolf & Jones, New York City, for appellee Suchoff.

Irwin Karp, New York City, for Authors League of America, Inc., as amicus curiae.

Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

This appeal presents the question whether a musical composition the rights to which are assigned by the composer and which is performed during his lifetime is nevertheless "posthumous" within the meaning of the copyright renewal provision, § 24 of the Copyright Act, 17 U.S.C. § 24,[1] because it has not been published or, more precisely, printed (and therefore not copyrighted) until after his death. Appellant, Peter Bartok, a son of composer Bela Bartok, is appealing the decision of Judge Richard Owen of the United States District Court for the Southern District of New York holding that Bartok's *Concerto for Orchestra,* one of the contemporary composer's most popular compositions, is a posthumous work. According to the renewal provision of the very loosely drawn 17 U.S.C. § 24, a proprietor of *inter alia* a copyrighted "posthumous work" is entitled to renew the copyright, whereas the author or certain of the author's surviving kin is entitled to the renewal of most other works. Here both Boosey & Hawkes, Inc. (Boosey), the music publisher and proprietor of the initial copyright of *Concerto for Orchestra,* and Peter Bartok are claiming the right to renew the copyright. Boosey argues that it is the proprietor of a posthumous work; Peter Bartok argues that the work is not posthumous. The trustee for Bela Bartok's estate, Benjamin Suchoff, argues as does Boosey that the work is posthumous.[2]

1. 17 U.S.C. § 24 (1947).

The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: *Provided,* That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.

2. Under a 1949 agreement signed by appellant Peter Bartok, the composer's widow and the estate, Boosey will pay royalties during the renewal period to the estate which, pursuant to the provisions of Bela Bartok's will, pays the proceeds to Mrs. Bartok for her lifetime and then to her sons after her death. Should appellant prevail the royalties presumably will be paid in equal shares to Mrs. Bartok and her two sons. The proprietor, Boosey, has been wholly scrupulous in protecting the Bartok family's rights in any case.

Judge Owen's holding confers that right on Boosey. We must reverse.

*Concerto for Orchestra* was composed by Bartok between August 15 and October 8, 1943, after a visit by the conductor Serge Koussevitzky to Bartok's hospital room. Bartok was suffering from leukemia, which was to take his life in September, 1945. The *Concerto for Orchestra* was first performed by the Boston Symphony, Koussevitzky conducting, on December 1 and 2, 1944, in Symphony Hall, Boston. The *Concerto* was again performed in Boston on December 29 and 30, 1944, and at Carnegie Hall in New York on January 10 and 13, 1945, and broadcast over radio.

After completing the *Concerto,* Bartok assigned his rights in the work to Boosey pursuant to their 1939 publishing contract. Boosey was to prepare the orchestra parts and print the full score within six months. The printing was to be done in England, but wartime conditions delayed completion, as did some rewriting by Bartok after the premiere. Thus Bartok was still receiving and correcting printer's proofs as late as June, 1945, three months before his death. Printing of the manuscript was not completed and therefore not copyrighted by Boosey until March 20, 1946, six months *after* Bartok's death.

The first 28 year copyright term held by Boosey, defined by 17 U.S.C. § 24, expired in March, 1974. Both Boosey and Peter Bartok filed renewal applications. The Register of Copyrights permitted the filing of both renewals, expressly declining to adjudicate between them.

Judge Owen felt "constrained to conclude" that *Concerto for Orchestra* is a "posthumous work" for purposes of § 24, finding that it was "published" and copyrighted after Bartok's death. Judge Owen relied on the definition of "posthumous" used by the Register of Copyrights and examples in musical history. He concluded, however, that were he to look solely to congressional intent he would hold the work not posthumous. *Bartok v. Boosey & Hawkes, Inc.,* 382 F.Supp. 880, 883 (S.D.N.Y.1974). We find that we must give controlling weight to the legislative purpose in this case of first impression,[3] and thus reverse.

We agree with Judge Owen that the rationale of the renewal period in § 24 is clear. We are fully aware of the dangers of relying upon isolated bits of legislative history in statutory reconstruction, Jackson, *J.,* concurring in *Schwegmann Brothers v. Calvert Distillers Corp.,* 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), but there are exceptions proving the rule. On March 27, 1908, at the Congressional Committee Hearings before the Joint Committee on Patents, the following colloquy took place between the chairman and William Allen Jenner of New York on the subject whether to extend the author's term of copyright for an additional fourteen years:

*The Chairman:* I would like to ask you a question. Would not the publisher, if a third term were given, make a contract with the author stipulating that not only was he to have control of the publication for the first twenty-eight years, but that he should control it, and the right to publish it, under the original contract, for the fourteen-year extension period and if we give another extension of fourteen years, then for the second fourteen-year period?

*Mr. Jenner:* It is never done, and I have some doubt about whether it legally could be done. But I should be glad to see that so provided for that it could not be done under the law.

*Representative Law:* Then put it in the bill itself.

*Mr. Jenner:* Put it in the bill itself, and say that it cannot be done, so that the author is certain to have that extension as a provision for his age or a

---

**3.** All parties agree that this is such a case. 2 M. Nimmer, The Law of Copyright § 114.1, at 464 (1974 ed.), is in accord.

provision for his widow and his children.

Thereafter, the House Committee reporting out the 1909 Act called for one 28 year renewal, and in connection therewith had the following to say:

> Your Committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right.

H.R.Rep.No.2222, 60th Cong., 2d Sess. 14 (1909). *See* 2 M. Nimmer, The Law of Copyright § 113, at 461, and § 117.21, at 493–94 (1974 ed.). This congressional purpose—to give the author or his family the renewal right—has been recognized by the courts, although not in any recent case. *See Harris v. Coca-Cola Co.,* 73 F.2d 370, 371 (5th Cir. 1934):

> The second period is intended, not as an incident of the first for the benefit of the then owner of the expiring copyright, but as a second recognition extended by the law to the author of work that has proven permanently meritorious by giving directly to him, if alive, or if not, to his widow, children, next of kin or executor . . . a supplementary copyright upon the terms stated in the statute.

*See also White-Smith Music Publishing Co. v. Goff,* 187 F. 247, 251 (1st Cir. 1911). As the Supreme Court said in *Fred Fisher Music Co. v. Witmark & Sons,* 318 U.S. 643, 653–54, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), the "basic consideration of policy underlying the renewal provision" was the right of "the author to sell his 'copyright' without losing his renewal interest."

A "posthumous work" is one of the three exceptions to the renewal statute. The only definition of "posthumous" which fulfills the legislative purpose of protecting authors and their families is that in the narrow situation—not present here—where a contract for copyright was never executed by the author during his life. *See* 2 M. Nimmer, *supra,* § 114.1, at 464; Kupferman, *Renewal of Copyright,* 44 Colum.L.Rev. 712 (1944). In that case the estate can make its own contract and thereby protect itself. For example, had the work here been found among Bartok's effects, his widow and children could and presumably would have made their own arrangements to have it published. In that case the logical basis for excepting the widow and children from statutory protection is that, as original proprietors, they would have no need of it. *See* Kupferman, *supra,* 44 Colum.L.Rev. at 715.

In this case, however, where the copyright contract was executed before the author's death, the family has no means of protection other than the statutory renewal right;[4] this is equally true whether the work is available in print or not. Yet the district court's definition of "posthumous" would create a legislative discrimination between families in these two equally unprotected situations. Where, as here, death occurs after copyright sale, but before publication, one commentator agrees that "no one has suggested any possible reason why the rights of the statutory beneficiaries should be defeated in such an instance." Bricker, *Renewal and Extension of Copyright,* 29 S.Cal.L.Rev. 23, 38–39 (1955). *See* Kupferman, *supra,* 44 Colum.L.Rev. at 715.

As Nimmer points out, the legislative purpose of protecting authors and their families derives not so much from a paternalistic view toward authors as a class as from the economic reality that

> the form of property designated copyright, unlike real property and other forms of personal property, is by its

---

4. *But see* note 2 *supra.* For purposes of this case it has to be assumed that the publisher would have only its own interests in mind on renewal.

very nature incapable of accurate monetary evaluation prior to its exploitation.

2 M. Nimmer, *supra* § 113, at 462. This purpose is equally salient for all families where the copyright sale is during the author's lifetime. In short, where the legislative purpose of the statute is to extend protection to an author and his family, it makes better sense to read the "posthumous work" exception as a withholding of unnecessary protection where the family can protect itself, rather than as an illogical discrimination between families who are in equal need of protection.

■ Given this legislative purpose we do not feel compelled to define the term "posthumous," as did Judge Owen, by correlating it to one particular definition of the word "publish," a term which itself has a variety of definitions in the Copyright Act depending upon the context.[5] Judge Owen used the definition of "posthumous work" as a work "published after the death of its author," citing B. Ringer, *Renewal of Copyright,* Copyright Office Study No. 31 at 128. He also relied on a quotation from 2 M. Nimmer, *supra* § 114.1, at 463–64 (referring to the dictionary definition of "posthumous"). But Nimmer states that "publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public . . ." 1 M. Nimmer, *supra* § 49, at 194–95.[6] In

---

**5.** *See American Visuals Corp. v. Holland,* 239 F.2d 740, 742 (2d Cir. 1956), which states

> the term "publication" is clouded by semantic confusion where the term is defined for different purposes, and that we have here an illustration of the one-word-one-meaning-only fallacy.

As Judge Frank stated in a footnote, 239 F.2d at 742 n.2:

> Such confusion could perhaps be avoided by using different words in the different contexts. . . . Another device is, in some contexts, either to cut off the initial letter of the word (so that we would have "publication" and "ublication") or to spell the word backwards (yielding "publication" and "noitacilbup"). . . .

The opinion goes on to state

> [that where only common law protection is sought] the courts will require considerably more open dissemination before holding that publication has taken place so as to deprive the creator of the material of his rights in it, than (b) where a copyright certificate has been obtained and the plaintiff is claiming sufficient publication to enable him to maintain an action on the federal statute.

*Id.* at 743.

**6.** The definition of "publication" in § 26 of the Act only fixes the date when the copyright term begins to run and does not define "publication" itself. 1 M. Nimmer, *supra* § 49, at 193. It would be deceptively simplistic to construe § 24 of the Act in the light of dictionary definitions which incorporate "publication" after death into the meaning of "posthumous" as applied to authors' works. Neither Webster's nor any other dictionary definition refers to the Copyright Act concept of "publication,"

a definition sufficiently technical that the leading copyright treatise takes an entire chapter to explain it. 1 M. Nimmer, *supra* ch. 4. Semantically, moreover, the word "posthumous" does not even carry with it a connotation of publication, being limited to describe the lastborn of a family and so to one born after his father's death. *See* H. Fowler, A Dictionary of Modern English Usage 468 (2d ed., revised 1965). Bartok's *Concerto* was indeed a creation conceived, born and very much made known to the world during its progenitor's lifetime. Certainly when Bartok delivered his work to his publisher under a contract providing for publication and performance he was not considering that he was dealing with a posthumous work. As Nimmer says in reference to the "posthumous" renewal provision,

> The preference of proprietor over author, or necessarily in this instance, his widow and children (or executor or next of kin), seems least justified in the case of posthumous works. It is precisely in the publication of such works that the author's family may most rely for financial support. It further remains to be seen whether the courts will hold that a work is posthumous if it is publicly disseminated during the author's lifetime but not published in a technical sense until after the author's death. In view of the questionable rationale for this provision, and the possible legislative oversight in including it among the proprietor renewals, it would seem that a construction is justified which includes among posthumous works only those which have received no public dissemination in any form during the author's life.

2 M. Nimmer, *supra* § 114.1, at 464–65.

**946**

this case Bartok had completed the *Concerto,* had heard it performed, had executed a contract for its copyright, and had corrected published proofs, all before his death. While the tangible copies had not been distributed to the public before Bartok's death, orchestra parts had been distributed at least to members of the Boston Symphony and the general public had heard the *Concerto* both in concert and on the radio. The work, as they heard it, was substantially as Bartok intended it to be heard, and the proofs contained his revisions. This is not the case where a composer never released a work for public dissemination, although he may have performed it occasionally,[7] so that when the work is distributed after the composer's death, the public never knows whether he intended substantial

revisions.[8] We need not pass on the question when publication has occurred; we simply point out that defining a "posthumous work" as one that is not published until after the author's death carries with it the implicit problem what is publication as well as the implicit danger that an unscrupulous publisher could purposely delay publication in order to obtain renewal rights.

■ Judge Owen also relied on the form provided by the Register of Copyrights (Circular 1B) which defines "posthumous" as a "work first published and copyrighted after the death of the author." And yet the Copyright Office has no authority to give opinions or define legal terms[9] and its interpretation on an

Needless to say, we do not subscribe to the views on publication of musical works expressed in the dissenting opinion, an issue we need not reach.

7. The district court analogized the *Concerto* to Frederic Chopin's *Rondo in C Major for Two Pianos, Opus 73.* Judge Owen, himself a composer, relates that the *Rondo* was published as a "posthumous" work six years after Chopin's death even though it had been previously performed by the composer approximately 20 years earlier. From these facts the court concluded that the term "posthumous" had been internationally defined in terms of publication for at least 120 years, as Chopin died in 1849. 382 F.Supp. at 884.

True, both the Chopin work and the Bartok work had been performed in their respective authors' lifetimes. The Chopin *Rondo* was composed 21 years prior to Chopin's death and was played by him soon afterward, but the manuscript was thereafter laid aside by Chopin for reasons not known. It was not given to any publisher. *No arrangement for publication of the work was made by Chopin in his life,* and the manuscript and associated copyright of the *Rondo* remained Chopin's property until his death. The manuscript was later found among those of numerous other published works by a friend named Julian Fontana, who arranged the publication of these works in cooperation with Chopin's family in 1855, six years after the composer's death.

As for the emphasis in note 2 of the dissent upon the practice of numbering compositions according to the date of publication, we do not consider this system, artificially devised by publishers themselves, to be objective or relevant in determining the intended policy of § 24 of the Copyright Act. Nor do we believe that

a publisher's designation of "op. posth." can be relied upon as the last word in the characterization of a composition. Paradoxically, Bartok's *Concerto for Orchestra* itself, which the dissent would make "posthumous," was *not* designated as an "op. posth." by its publisher.

Finally, the dissent's reference to the 21-year delay in the publication of Chopin's *Variations for the Piano on a German Air* could very well be a prime example of the danger of Copyright Act abuse by a publisher purposely delaying publication to secure renewal rights to which an author's family would otherwise be entitled.

8. Judge Owen himself states that Peter Bartok argues "not illogically" that the work here in question does not conform even to the dictionary definition of "posthumous," in the light of its public performance prior to the composer's death.

9. *See* 37 C.F.R. § 201.2(a)(1) which provides in relevant part:

The Copyright Office, however, does not undertake the making of comparisons of copyright deposits to determine similarity between works, nor does it give legal opinions or advice on such matters as:

(i) The validity or status of any copyright other than the facts shown in the records of the Office;

(ii) The rights of persons, whether in connection with cases of alleged copyright infringement, contracts between authors and publishers or other matters of a similar nature;

(iii) The scope and extent of protection of works in foreign countries or interpretation of foreign copyright laws or court opinions;

(iv) The sufficiency, extent or scope of compliance with the copyright law.

issue never before decided[10] should not be given controlling weight. *See DeSylva v. Ballentine,* 351 U.S. 570, 577–78, 76 S.Ct. 974, 100 L.Ed. 1415 (1956).

■ Appellees rely heavily on the phrase in the statute here italicized, "of any posthumous work or of any periodical, cyclopedic, or other composite work *upon which the copyright was originally secured by the proprietor thereof . . . .*" The argument is that this phrase implies that the date for determining what is posthumous is the date of copyright. Even assuming, however, that the italicized phrase modifies both posthumous works and periodicals, it is not useful in defining what is posthumous. Its use is only to define the time from which a renewal term dates since without a fixed point in time for the first copyright there could be no fixed renewal period. No one would argue that the date of copyright and publication is used to define a "periodical, cyclopedic, or other composite" work. Likewise the phrase has no definitional value for a "posthumous work." Words undefined in a statute must be construed to further, rather than frustrate, the legislative intent or purpose. *Commissioner of Internal Revenue v. Brown,* 380 U.S. 563, 571–72, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); *Knapp v. McFarland,* 462 F.2d 935, 939–40 (2d Cir. 1972); *Salt River Project Agricultural Improvement and Power District v. FPC,* 129 U.S.App.D.C. 117, 391 F.2d 470, 474, *cert. denied sub nom. Arkansas Valley G & T, Inc. v. FPC,,* 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968). As the master of statutory interpretation once put it,

> it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, *J.*), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

■ All parties rely on the dictum by Judge Learned Hand in *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 699 (2d Cir. 1941), discussing the proprietor exceptions in what is now § 24 of the Copyright Act by saying,

> The first class provides for "posthumous" works, i. e., those on which the original copyright has been taken out by someone to whom the literary property passed before publication.

The dictum has its own ambiguity. We sense Judge Hand to have been thinking of "passed" in the usual sense of transfer by inheritance or intestacy, but not of transfer by contract. But even if we are wrong we cannot place too much emphasis on an ambiguous word in a mention en passant, not vital to the decision, even by the master. Since an initial assignment of a copyright renewal term by the author can vest in the publisher only if the author remains alive at the time of renewal, *see* 2 M. Nimmer, *supra* § 117.3, at 503, and cases cited therein, we do not see that an assignment of the renewal term should here vest solely because the war delayed the printing of the score.

Finally, the rationale for the exception for posthumous works, if defined as works the right to copyright which has passed by will or intestacy, is more analogous to the rationale for the other ex-

---

In addition the Circular 1B states:

> The Copyright Office is primarily an office of record: a place where claims to copyright are registered when the claimant has complied with the requirements of the copyright laws. However, the regulations of the Copyright Office (Code of Federal Regulations, Title 37, Ch. II) prohibit us from giving legal advice or opinions.

**10.** As this is a case of first impression, it is unlikely, when preparing the form, that the Register of Copyrights considered the situation where a work has been widely performed and a contract to copyright has been executed by a composer during his lifetime, with the intent that the copyright should be completed during his lifetime. Publication here probably would have occurred in Bartok's lifetime had London not been extensively bombed and mail delivery extensively delayed.

ceptions in § 24. Where such a "passing" has occurred, it may be many years before the work is performed, distributed and copyrighted originally; therefore the renewal right may vest beyond the life of the author's children; there may be many heirs difficult to locate. In a periodical or cyclopedic work, presumably the rationale of the renewal term is to avoid the inconvenience of needing many contributors to join in order to renew the entire work, although contributors can renew individual contributions, raising the question whether the proprietor in the event of such an individual renewal has a right to renew such works, a question in grave doubt. *See* B. Ringer and P. Gitlin, Copyrights 60–61 (1965); 2 M. Nimmer, *supra* § 114.2. Commentators agree that the provision for renewal rights for a "corporate body (otherwise than an assignee or licensee of the individual author)" is practically meaningless, *see* Ringer & Gitlin, *supra* at 59 n. 42, except as a statement that corporate assignees of a copyright, as in this case, are *not* entitled to renew the copyright.[11] 2 M. Nimmer, *supra* § 114.-3, at 469. As for employers' renewal rights, if those who have paid employees to create a work were not able to renew the copyright, it would be less profitable, for example, to make films, and it would be difficult in the case where many employees create a work, such as a Disney cartoon, to determine who the author or authors are. The "posthumous work" exclusion appears to us consistent with the other exclusions from § 24 as we have read that section.

Most of the arguments made in the dissent are answered in the course of the foregoing opinion. The dissent's quarrel with our "philosophy" is evidently a quarrel with the House Committee report on the 1909 Act quoted in our opinion (and in 2 M. Nimmer, *supra* App. I, at 967–77) and with the underlying rationale of the renewal concept as set forth in 2 M. Nimmer, *supra* § 113, at

462, also quoted above. The suggestion made that somehow this decision will result in voiding copyright renewals made by assignees at the expense of the author's family is based on the overly broad and gratuitous assertion in a district court opinion, *Von Tilzer v. Jerry Vogel Music Co.*, 53 F.Supp. 191, 196 (S.D.N.Y.1943), *aff'd sub nom. Gumm v. Jerry Vogel Music Co.*, 158 F.2d 516 (2d Cir. 1946); the actual source of the assertion is the inapposite context of *Tobani v. Carl Fischer, Inc.*, 98 F.2d 57, 60 (2d Cir.), *cert. denied*, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1938), which denied to those who fail to renew a copyright the right to sue for the conveyance of void copyright renewal registrations of others.

Mindful of the dissent's warnings, however, we rely on the well-established doctrine that the copyright title procured may be held in trust for the benefit of the persons who are rightfully entitled thereto. *Harms v. Stern*, 229 F. 42, 46 (2d Cir. 1915), *vacated on rehearing on other grounds*, 231 F. 645 (2d Cir. 1916). *See Silverman v. Sunrise Pictures Corp.*, 273 F. 909, 914 (2d Cir. 1921), *cert. denied*, 262 U.S. 758, 43 S.Ct. 705, 67 L.Ed. 1219 (1923) (title held in trust by sisters for class of next of kin); *Maurel v. Smith*, 271 F. 211, 215 (2d Cir. 1921) (title held in trust for joint author as joint owner); *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 49 F.Supp. 135 (S.D.N.Y.1943), *aff'd*, 140 F.2d 270 (2d Cir. 1944). To avoid any possibility of invalidation of renewal copyrights previously made by proprietors in the limited class of those in Boosey's position here upon reliance on the Copyright Office's Circular No. 15, the effect of this decision shall be prospective only. That is, our decision will apply only to future and pending renewals, as well as to the parties here, and will not operate to void the legal title to renewal copyrights held by those proprietors in Boosey's class. Instead, the au-

---

11. A mere licensee may not claim an original term copyright, much less its renewal, 1 M. Nimmer, *supra* §§ 61, 114.3, 468 n. 55, so that the exclusion with respect to a licensee in this very ambiguous statute appears meaningless.

thor's "widow, widower, or children, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin" shall be deemed to be the equitable owners of the renewal rights and have their remedy against the legal proprietors for the rights to which they are entitled under our decision here.[12]

For the above reasons the judgment is reversed.

VAN GRAAFEILAND, Circuit Judge (dissenting):

As one whose musical accomplishments go barely beyond a mastery of "Chopsticks", I take up the cudgels for appellees with some diffidence. However, since I believe that this case is being wrongly decided, I must respectfully express my dissent.

To place the opinion of my brothers in proper perspective, one should bear in mind that the contest herein is not between the penurious family of a deceased composer and an "unscrupulous" publisher; it is between a son and his mother. Bela Bartok, as a loving and thoughtful husband, executed a will in which he left the royalties from all copyrights and renewal copyrights in trust for his widow with the remainder, upon her death, to his son Peter, the appellant herein. Apparently, appellant is unwilling to wait for his remainder to accrue.

He asks this Court to declare that appellee publisher has no right to renew the copyright of his father's works and to continue to pay all royalties following such renewal to his mother. Instead, he claims the right of renewal with his mother and brother, with the result that Bela Bartok's widow, to whom the composer left all the royalties during her lifetime, will end up getting only one-third of them, the remaining two-thirds going to appellant and his brother. I believe that the injustice to Mr. Bartok's widow which results from the majority's frustration of Mr. Bartok's wishes is neither required nor justified by the Copyright Law.

The provisions governing copyright renewal are contained in § 24 of the Copyright Law (17 U.S.C. § 24). This provides in pertinent part:

"That in the case of any posthumous work . . . upon which the copy-

---

12. The seeming relevance of the quotation from Mr. Justice Frankfurter featured by the dissent disappears when one recognizes it was made in the context of determining (affirmatively) the issue whether an author's right to obtain a copyright renewal is assignable at all by an agreement made before the expiration of the original copyright term. *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943) (5–3 decision). It is rather significant, however, that such an agreement is not valid if the author dies before the end of the term, that is to say, the family in the event of the author's death takes free and clear of the assignment. *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960) (5–4 decision); *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406 (2d Cir. 1946), *cert. denied*, 331 U.S. 820, 67 S.Ct. 1310, 91 L.Ed. 1837 (1947); *Silverman v. Sunrise Pictures Corp.*, 273 F. 909 (2d Cir. 1921), *cert. denied*, 262 U.S. 758, 43 S.Ct. 705, 67 L.Ed. 1219 (1923); 2 M. Nimmer, *supra* § 117.3, at 503. Moreover, an assignment without mention of the renewal rights conveys no interest in the renewal rights absent contrary evidence.

*Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737 (2d Cir. 1975).

The dissent refers throughout to "widows" and pictures the "distraught widow" negotiating with the publisher for the sale and assignment of renewal rights. Most authors or composers, we should suppose, like other testators, rely on others to act on their family's behalf; Congress, when it contemplated exercise of renewal rights by an author's family in the case of an assignment in which the author does not live to the end of the original term, evidently was not concerned about any undue disadvantage of a "distraught widow." We do not think it was so concerned in its definition of what is a posthumous work. Similarly, the argument that the decision reduces the value of what the composer has to sell when he is most in need is belied by the way Congress deals with renewal rights where the author does not live out the original term. Nimmer agrees with us that the construction we give the statute "would better seem to protect the interests of those for whom the author wishes to provide upon his death." 2 M. Nimmer, *supra* § 114.1, at 464.

right was originally secured by the proprietor thereof . . . the proprietor of such copyright shall be entitled to a renewal and extension of the copyright of such work for the further term of twenty-eight years . . .: That in the case of any other copyrighted work . . . the widow, widower, or children of the author . . . shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years . . . ."

Judge Owen found that the word "posthumous" as used in the field of music for over a century has a specific meaning, i. e., "published after the death of its author". My colleagues do not hold this finding to be erroneous, as indeed they could not. My limited facilities for research completely substantiate it and indicate further that the same finding could be made in the field of literature. The following references are illustrative:

Dunstan, A Cyclopaedic Dictionary of Music (1973):

"Published after the composer's death."

Blom, Everyman's Dictionary of Music (1971):

"A work published after its composer's death is described as Posthumous. The common abbreviation is Op. posth."

Riemann, Encyclopaedic Dictionary of Music (1908):

". . . published after the death of the author."

The Oxford English Dictionary (1933):

"Of a book or writing: Published after the death of the author."

Johnson, Dictionary of the English Language (1829):

"Done, had, or published after one's death."

Webster's Third New International Dictionary (1971):

"Published after the death of its author, as posthumous poems."

Ringer, Renewal of Copyrights 128 (Copyright Office Study No. 31):

"The generally accepted definition of 'posthumous works' is 'one which is published subsequent to the death of its author'."

Ball, The Law of Copyright and Literary Property § 89, at 195 (1944):

"A posthumous work is one originally published and copyrighted after the author's death. . . ."

1 Fisher, Studies on Copyright 524 (1963):

"The generally-accepted definition of 'posthumous work' is 'one which is published subsequent to the death of its author'."

Ringer and Gitlin, Copyrights 59 (1965):

"The term 'posthumous work' is not defined in the statute, but in general it probably refers to works published for the first time after the author's death."

Nicholson, A Manual of Copyright Practice 144 (2d ed. 1956):

". . . works published after the author's death."

Kupferman, Renewal of Copyright, 44 Colum.L.Rev. 713, 715 (1944):

"This must mean a work published after the author's death by someone to whom he passed the right to reproduce it."

Bricker, Renewal and Extension of Copyright, 29 S.Cal.L.Rev. 23, 38 (1955):

"A posthumous work is one which is published subsequent to the death of its author."

2 Nimmer, The Law of Copyright § 114.1 (1975):

"The accepted dictionary definition for 'posthumous' used in this context is 'Published after the death of its author, as posthumous poems'."

Funk & Wagnall's Standard Dictionary (Britannica World Language Ed. 1963):

". . . published after the author's death, as a book."

Shorter Oxford English Dictionary (1933):

". . . of a book or writing: Published after the death of the author 1668." [1]

Berk, Legal Protection for the Creative Musician 190, at § 7.3 (1970):

". . . a posthumous work is, of course, simply one which is published after the death of the author. . . ."

The New Century Dictionary (1927):

". . . published after the death of the author, (as, a posthumous book)."

The Century Dictionary and Encyclopedia (1895):

". . . appearing or existing after the death or cessation of that to which its origin is due; especially of books published after the death of the author: as to posthumous works." [2]

Having established the existence of a commonly accepted and well established meaning for the term "posthumous works", Judge Owen then applied an equally accepted and established rule of statutory interpretation, viz., "The popular or accepted import of words furnishes the general rule for the interpretation of statutes." *Shaw v. Dreyfus*, 172 F.2d 140, 142 (2d Cir.), *cert. denied*, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949); *Banks v. Chicago Grain Trimmers*, 390 U.S. 459, 465, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1967); *United States v. Peller*, 170 F.2d 1006, 1007 (2d Cir. 1948).[3]

In *United States v. Blasius*, 397 F.2d 203 (2d Cir.), *cert. dismissed*, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1968), we said:

"It must be assumed 'that the legislative purpose is expressed by the ordinary meaning' of words used in the statute [citations omitted], and where they have a basic and usual sense, they require no resort to legislative history."

My brothers, nonetheless, rely heavily on certain congressional dialogue which they quote at some length. This discussion concerned a debate then taking place before the 1908 Joint Congressional Committee on whether the proposed new law should provide for a long non-renewable copyright term or a shorter renewable one. *See* Arguments before the Committee on Patents of the Senate and House of Representatives Conjointly on the Pending Bills to Amend and Consolidate the Acts Respecting Copyright (1906–8). The Congress opted for the latter. At the same time, it specified four situations in which the ordinary rules of renewal would not apply—post-

1. The date 1668 refers to the earliest known occurrence of this meaning.

2. The abbreviated phrase "Op. posth." (posthumous work) which appears on many published compositions is well known to every student of music. Equally well known is the fact that opus numbers for many classical compositions were assigned by the publishers according to the dates of the publication, many of which were after the death of the composer. For example, compositions 66 through 74 of Chopin were all published and numbered posthumously. Bidou, Chopin 264 (1927).

   Whatever may be the situation regarding Chopin's *Rondo* discussed in n. 7 of the majority opinion, the fact remains that some of Chopin's posthumous works were in the hands of publishers prior to his death. Bidou points out that Chopin's "Variations for the Piano on a German Air", published by Haslinger in 1851, two years after Chopin's death, had been in Haslinger's possession since 1830. In any event, the classification of a work as posthumous was determined in each instance by the date of publication.

3. With all due respect to my colleagues, I do not believe that the statement in the majority opinion that Judge Owen concluded "that were he to look solely to congressional intent he would hold the work not posthumous" correctly interprets Judge Owen's holding. This creates an unfair inference that Judge Owen interpreted the statute in a manner which he believed to be contrary to the intent of the Congress.

humous works, composite works, works copyrighted by a corporate body and works copyrighted by an employer for whom such works were made for hire.

From the outset of the Joint Committee's deliberations, it was obvious that these four exceptions were to be given different treatment than ordinary works of copyright insofar as the copyright term was concerned. However, I find nothing in the language which the majority quotes, or anywhere else in the reports of the Joint Committee's hearings, which indicates that the term "posthumous works" was to be given a meaning different from that which it had had for hundreds of years, viz., works published after the death of the author.

I cannot believe that Judge Hand was unfamiliar with this traditional and commonly accepted definition when he wrote his opinion in *Shapiro, Bernstein & Co. v. Bryan*, 123 F.2d 697 (2d Cir. 1941). His description of "posthumous works" as "those on which the original copyright has been taken out by someone to whom the literary property passed before publication" was, therefore, in my opinion, simply a reiteration of the same definition.

Judge Hand discussed posthumous works in the same breath as composite works and works copyrighted by an employer, for whom such works were made for hire, and said that these cover "those cases in which the 'proprietor' of the copyright . . . is not the author of the work". It seems rather obvious that he was discussing proprietorships which came into being during the author's lifetime. This accords with the language of § 9 (17 U.S.C. § 9) which provides in part:

> "The author or proprietor of any work made the subject of copyright by this title, *or his executors, administrators, or assigns*, shall have copyright for

such work . . . ." (Emphasis supplied).[4]

In short, I agree with the commentator in 29 S.Cal.L.Rev. 23, 39, *supra*, who said, ". . . there is nothing in the statute, Committee Report or any judicial opinion which would indicate that the term posthumous works was intended to have anything but its ordinary and usual meaning."

Finally, and most significantly, the United States Copyright Office itself has adopted and used the same definition as the above cited authorities. If we examine the records of that office, we see that in Circular No. 15 (1953) "posthumous works" are defined as "works published and copyrighted after the death of the author".[5] The identical definition is contained in the Copyright Office's "Certificate of Registration of a Claim to Renewal Copyright". This is a "contemporaneous and long-continued construction of the statutes by the agency charged to administer them", *Mazer v. Stein*, 347 U.S. 201, 213, 74 S.Ct. 460, 468, 98 L.Ed. 630 (1954), and courts should ordinarily "give weight to the interpretation of an ambiguous statute by the agency charged with its administration". *DeSylva v. Ballentine*, 351 U.S. 570, 577, 76 S.Ct. 974, 978, 100 L.Ed. 1415 (1956).

Of course, my brothers are correct in stating that the interpretation of the Copyright Office should not be given "controlling weight". Yet, before the guidelines of the Copyright Office are swept aside, some thought should be given as to what is being swept with them. One wonders, for example, how many widows and children are depending upon royalties from copyright renewals filed in accordance with the existing guidelines. "A renewal of a copyright by a person not entitled thereto is void and cannot be cured by subsequent ratifica-

---

4. *Public Ledger v. New York Times*, 275 F. 562 (S.D.N.Y.1921) (L. Hand, *J.*): "I think the word 'proprietor' of the present act must be treated as having the same meaning as in the old and as equivalent to 'assign'."

5. Cited as authoritative in Seidel, What the General Practitioner Should Know About Trademarks and Copyrights 134 (1959).

tion by the person allegedly entitled to renew." *Von Tilzer v. Jerry Vogel Music Co.*, 53 F.Supp. 191, 196 (S.D.N.Y. 1943), *aff'd sub nom. Gumm v. Jerry Vogel Music Co.*, 158 F.2d 516 (2d Cir. 1946); *Tobani v. Carl Fischer, Inc.*, 98 F.2d 57 (2d Cir.), *cert. denied*, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1932).

One wonders, also, how many widows like Mrs. Bartok, will be deprived of the full benefit of their husband's testate bounty because this Court is now changing the long-standing rules of the Copyright Office upon which the will was predicated.[6]

The affidavits submitted below establish, to my satisfaction at least, that there was no publication of Bela Bartok's *Concerto* prior to his death. The intimation in the majority opinion that the playing of the *Concerto* in concert might have constituted a publication is completely without support in the law. A public performance of a musical composition is not a publication or an abandonment of the composition to the public. *Ferris v. Frohman*, 223 U.S. 424, 435, 32 S.Ct. 263, 56 L.Ed. 492 (1912); *Nutt v. National Institute*, 31 F.2d 236, 238 (2d Cir. 1929); *Rosette v. Rainbo Record Manufacturing Corp.*, 354 F.Supp. 1183 (S.D.N.Y.1973); *McCarthy and Fischer, Inc. v. White*, 259 F. 364 (S.D.N.Y.1919); 1 Nimmer, The Law of Copyright, § 53.1, at 208 (1975); Goldstein, Copyrighting the New Music 10 (Ascap Copyright Law Symposium, Number Sixteen, 1966). The original Certificate of Registration gives the date of publication as March 20, 1946, six months after the composer's death. This is prima facie proof of the facts. *Ger-*

*lach-Barklow Co. v. Morris & Bendien*, 23 F.2d 159 (2d Cir. 1927); *Freudenthal v. Hebrew Publishing Co.*, 44 F.Supp. 754 (S.D.N.Y.1942). This proof has not been rebutted.

In the final analysis, my objection to what this Court does today can best be summarized by the following admonition of Mr. Justice Frankfurter in *Addison v. Holly Hill Co.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944):

"While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function. Construction is not legislation and must avoid 'that retrospective expansion of meaning which properly deserves the stigma of judicial legislation.' *Kirschbaum Co. v. Walling*, 316 U.S. 517, 522 [62 S.Ct. 1116, 1119, 86 L.Ed. 1638]. To blur the distinctive functions of the legislative and judicial processes is not conducive to responsible legislation."

My brothers are creating a definition of "posthumous works" which appears nowhere in the legislation or the legislative history; which is completely at odds with long-standing and accepted usage; which is contrary to the definition accepted by the Copyright Office and most authorities in the copyright field; and which is not unanimously recommended by those who seek change.[7] This is not the proper role of the judiciary.

I have no quarrel with my brothers' good intentions but question the philosophy which underlies them. I am not convinced, for example, that the dis-

---

**6.** Since the two preceding paragraphs were written, some additions have been made to the majority opinion. My brothers cite several cases to distinguish *Von Tilzer* and *Tobani* which I deem inapposite because they involve renewal applications made by less than all joint owners or owners in common.

My brothers also state that their decision shall be prospective only and shall not apply to those who, up to this date, have relied upon the copyright office's long-standing interpretation of "posthumous work". Putting aside any

argument as to the concession concerning long standing and accepted usage which may be implicit in such holding, I would only point out that the holding will be of little comfort to Mrs. Bartok whose case we are presently deciding.

**7.** Nimmer suggests, for example, that "posthumous works" shall include only those which have received no public dissemination during the author's life. 2 Nimmer, The Law of Copyright § 114.1 at 464–5 (1975).

traught widow of an author or composer is more capable than he to negotiate with a publisher for the sale and assignment of renewal rights. Giving full recognition to the increased worldliness of what was once described as the "weaker sex", it can hardly be seriously contended that a widow is in as good a position to evaluate the merits of a musical composition as was her husband who composed it. Neither does she have as complete and accurate knowledge of the music publishing field.[8]

Of course, a widow can wait for twenty-eight years before assigning her right to renew. But will she? She, like her deceased husband, must put groceries on the table today. Insofar as the composer is concerned, the decision of my brothers reduces the value of what he has to sell at the time when he probably is most in need.[9]

I see no compelling reasons why the resolution of these differences cannot await the considered judgment of the Congress which has been working on a revision of the 1909 Copyright Act for a number of years. Justice would then be accorded to Mrs. Bartok, and her husband's wishes would be fulfilled. In short, if I may again quote Mr. Justice Frankfurter, this time from his opinion in *Fisher Co. v. Witmark & Sons*, 318 U.S. 643, 657, 63 S.Ct. 773, 779, 87 L.Ed. 1055 (1943):

"It is not for courts to judge whether the interests of authors clearly lie upon one side of this question rather than the other. If an author cannot make an effective assignment of his renewal, it may be worthless to him when he is most in need. Nobody would pay an author for something he cannot sell. We cannot draw a principle of law from the familiar stories of garret-poverty of some men of literary genius. Even if we could do so, we cannot say that such men would regard with favor a rule of law preventing them from realizing on their assets when they are most in need of funds. Nor can we be unmindful of the fact that authors have themselves devised means of safeguarding their interests. We do not have such assured knowledge about authorship, and particularly about song writing, or the psychology of gifted writers and composers, as to justify us as judges in importing into Congressional legislation a denial to authors of the freedom to dispose of their property possessed by others. While authors may have habits making for intermittent want, they may have no less a spirit of independence which would resent treatment of them as wards under guardianship of the law."

I believe Judge Owen's decision was correct, and I would affirm.

---

**8.** Mr. Bartok's contract with his publisher provided for the following royalties:

15% of the selling price of all copies;

15% to 20% from the hire or purchase of orchestral material;

50% to 66⅔% of performing right fees;

70% to 80% of performing right fees from stage performances;

66⅔% of royalties and fees from mechanical adaptations;

50% of royalties and fees from reproduction in movies and television.

No one has expressed any dissatisfaction with this monetary arrangement.

**9.** "If promotion of artistic production *as a whole* is the overriding purpose of copyright, regulation of copyright transfers in the author's interest should be concerned predominantly with revenues that can be realized for the author relatively soon after creation, since the prospect of receiving a reward in the distant future will probably have negligible effect on an author's production. Little concern should be paid to revenues that will accrue only to the author's heirs."

Curtis, Protecting Authors in Copyright Transfers: Revision Bill § 203 and the Alternatives 194 (Ascap Copyright Law Symposium, Number twenty-one, 1971).