Douglas **FAULKNER, et al., Plaintiffs,**

v.

**NATIONAL GEOGRAPHIC SOCIETY, et al., Defendants.**

**David Hiser, et al., Plaintiffs,**

v.

**National Geographic Society, et al., Defendants.**

Nos. **97CIV.09361LAK, 99CIV.12488LAK.**

United States District Court, S.D. New York.

July 13, 2002.

Stephen A. Weingrad, Alessandro Turina, Weingrad & Weingrad LLP, New York City, for Plaintiffs.

Robert G. Sugarman, Naomi Jane Gray, Joanne McLaren, Pierre M. Davis, Armelle Nina VanDorp, Weil, Gotshal & Manges LLP, New York City, Terrence B. Adamson, National Geographic Society, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

KAPLAN, District Judge.

This is an action principally for copyright infringement and breach of contract by a number of photographers and writers whose work has been published in *National Geographic Magazine* (the "*Magazine*"). The essence of their claim is that they granted National Geographic Society ("NGS") limited rights to publish their works and that the defendants have infringed their intellectual property and contract rights by republishing their work beyond the rights granted to them, chiefly in electronic media. The matter is before the Court on the motion of de-

fendants NGS, National Geographic Enterprises, Inc. ("NGE"), Mindscape Inc. ("Mindscape"), Dataware Technologies, Inc. ("Dataware"), and Eastman Kodak Co. ("Kodak") for partial summary judgment dismissing plaintiffs' claims regarding their photographs and texts that appeared in the *Magazine* before 1978 (the "Pre–1978 Works").

### Facts

#### Defendants and Their Product

The facts concerning the defendants (other than Kodak[1]), the relationships among them and The Complete National Geographic[2] are set forth in the Court's opinion of even date in *Ward v. National Geographic Society*[3] and will not be repeated here.

Kodak is a manufacturer and developer of film and photographic equipment, among other products. In October 1997, Kodak entered into a co-sponsorship agreement with NGI, Mindscape and Dataware that provided that Kodak would pay a fee to NGI in exchange for inclusion of a Kodak promotional message in the digital contents of The Complete National Geographic[4] and advertising on the product packaging.[5] It specified also that the Kodak name and logo, together with the phrase "Proudly Sponsored by," would appear on the letterhead, printed materials, banners, posters and other similar materials used in connection with certain promotional media campaigns and that Kodak representatives would be invited to attend, speak and otherwise promote both Kodak and The Complete National Geographic at these events.[6] The agreement provided further that the parties would hold a sweepstakes in connection with the launch of The Complete National Geographic, that the Kodak name and logo would appear on all sweepstakes items, and that NGI and Kodak would contribute prizes to the sweepstakes.[7] Finally, it provided that Kodak would promote The Complete National Geographic and the sweepstakes on its website.[8] Kodak received 5,000 complimentary units of the first edition of The Complete National Geographic for promotional use only, which were not to be resold or made available for resale by Ko-

---

**1.** Kodak has been named a defendant in *Faulkner v. National Geographic Society*, 97 Civ. 09361(LAK), and *Hiser v. National Geographic Society*, 99 Civ. 12488(LAK), but not in *Ward v. National Geographic Society*, 99 Civ. 12385(LAK).

**2.** Unlike the plaintiff in the *Ward* action, plaintiffs here dispute the assertion that defendants used digital scanning technology to create The Complete National Geographic. *See* Pl. 56.1 St. ¶ 8. The Court understands plaintiffs' contention that the CD–ROM product is not necessarily an exact image-based reproduction of issues of the *Magazine* because the CD–ROM product may not mirror any single regional edition completely. However, it is undisputed that the CD–ROM product is a collection of digital files that include digital representations of plaintiffs' works. The precise technology used to create these files is immaterial for present purposes.

**3.** 208 F.Supp.2d 429 (S.D.N.Y.2002).

**4.** The Kodak promotional message is part of a multimedia sequence that appears each time a consumer boots up The Complete National Geographic on his or her computer. After the consumer's first time starting up the program, he or she can skip this multimedia sequence my mouse-clicking on it once. *See* Fahey Decl. ¶ 11.

**5.** *Compare* Def. 56.1 St. ¶¶ 19, 21, *with* Pl. 56.1 St. ¶¶ 19, 21.

**6.** Fahey Decl. Ex. C ¶ 1.c.

**7.** *Id.* ¶ 1.d.

**8.** *Id.* ¶ 1.e.

dak.[9] Kodak received no revenues or other remuneration from sales of The Complete National Geographic products.[10]

*Plaintiffs and Their Professional Relationships with NGS*

Plaintiffs are freelance writers and photographers, or· their successors, whose works have been published in various issues of the *Magazine*. Their professional relationships with NGS during the relevant time period took various forms and, at least for many of the contributors, the precise contours remain murky. Immediately below the Court will set out material undisputed facts regarding each of these relationships.

*Douglas and Sally Faulkner*

· Douglas Faulkner is a professional photographer and writer. Sally Faulkner is his .former wife. . Douglas Faulkner photographed two stories that.were published in the *Magazine* before 1978: "Finned Doctors of the Deep," published in December 1965 ("Finned Doctors"), and the "Chambered Nautilus," published in January 1976. When the Faulkners divorced in the mid–1970's, Douglas assigned to Sally the copyright in all ten Finned Doctors photographs.

NGS paid Faulkner $2,000 for the photographs and text used in Finned Doctors. In return, it received "first rights" and rights to use Finned Doctors photographs

and text "in [NGS's] other publications, including any purposes related to the Society's objectives." [11] NGS purchased "first publication rights" to the photographs in the Chambered Nautilus,[12] also for $2,000.

On June 22, 1997, Mr. Faulkner applied for individual registration of the Finned Doctors and Chambered Nautilus photographs and text.[13] In letters dated January 15, 1998 and August 10, 1998, the Copyright Office advised Faulkner that it was refusing registration because the photographs and text had been published with copyright notice only in the name of NGS.[14] It indicated, however, that because the *Magazine* had been registered. Faulkner could pursue renewal registration for the photographs and text associated with the Finned Doctors project.[15] Similarly, it indicated that the Chambered Nautilus photographs might be protected by virtue of the general notice for the *Magazine* and that Faulkner potentially could pursue renewal rights beginning in the twenty-eighth year following publication.[16]

On October 14, 2000, Mr. Faulkner applied to the Copyright Office to register a compilation entitled "Doug's Best," which was made up of the photographs and text from Finned Doctors and Chambered Nautilus, as well as another project re-

9. *Compare* Def. 56.1 St. ¶ 22, *with* Pl. 56.1 St. ¶ 22; *see also* Fahey Decl. Ex. C ¶ 7.

10. *Compare* Def. 56.1 St. ¶ 22, *with* Pl..56.1 St. ¶ 22.

11. *Compare* Def. 56.1 St. ¶ 33, *with* Pl. 56.1 St. ¶ 33; *see also* Appendix of Exhibits and Deposition Testimony in Support of Defendants' Motion to Dismiss and for Summary Judgment ("Def.App.") Ex. C–1.

12. *Compare* Def. 56.1 St. ¶ 34, *with* Pl. 56.1 St. ¶ 34; *see also* Def.App. Ex. D.

13. Plaintiff's Exhibits in Opposition to Defendants' Motions to Dismiss & Summary Judgment Volume I ("Pl.Ex. Opp.I") Bates Number 3–4. Plaintiffs failed to divide and mark their exhibits in a way that would enable the Court to refer to them individually. Hereinafter, the notation "B." will refer to "Bates Number."

14. *Id.* at B. 7–9, 10–11.

15. *Id.* at B. 9.

16. *Id.* at B. 10.

ferred to as "Dazzling Corals."[17] The Office replied by noting that the claim regarding "Doug's Best" was for "'compilation' authorship, not the authorship of the particular photos and text you sent us."[18] The examiner reminded Mr. Faulkner's counsel that compilation authorship involves "the selection, coordination, or arrangement of preexisting materials or data."[19] He went on to explain that the compilation lacked sufficient originality to support a copyright claim because the compilation consisted merely of the photographs and text published by NGS arranged in the order in which they had appeared in the *Magazine*.[20] In a subsequent letter, the Office again refused registration based on lack of originality, noting also that Mr. Faulkner had confirmed that the intent of his application was to claim "'compilation' authorship."[21]

After the present lawsuits were commenced, plaintiffs' counsel wrote to the General Counsel of the Copyright Office to give notice of the pending lawsuits pursuant to Section 411(a) of the Copyright Act of 1976 (the "1976 Act").[22] He apparently intended to give such notice for all of his clients at once,[23] referenced the captions of both lawsuits, and purportedly enclosed the amended complaints.[24] The letter stated also that counsel had enclosed "letters denying applications." It contained a second page entitled "Denied Copyright Applications for Compilations (Copies Attached)."[25] Included in the schedule on this page is "Doug's Best," but there is no mention of Finned Doctors or the Chambered Nautilus as individual works.[26] It therefore appears that plaintiffs' counsel gave Section 411(a) notice for the compilation Doug's Best, but not for the individual articles themselves.

### Arthur Allen

Arthur Allen was a professor of ornithological studies at Cornell University who published photographs and text in a number of issues of the *Magazine*, all before 1964.[27] Neither he nor his successor in interest, David Allen, applied for copyright or renewal registration prior to January 1993 for any of the works.[28]

---

17. *Id.* at B. 11–12.

18. *Id.* at B. 13.

19. *Id.*

20. *Id.*

21. *Id.* at B. 15.

22. 17 U.S.C. § 411(a).

23. Pls.' Ex. Opp. I, at B. 21–22.

24. Plaintiff only submitted the cover letter and a schedule of the supposedly attached applications that had been denied. *See id.* at B. 22.

25. *Id.* It is not at all clear why plaintiffs' counsel included the words "for Compilations." Some of the works on this schedule, such as Doug's Best, are compilations, but some of the works apparently are not, such as

the works by Jerome and Doranne Wilson Jacobson and Pamela Wilson Sartorelli.

26. *Id.*

27. Pl. 56.1 St. ¶ 25.

28. *Compare* Def. 56.1 St. ¶ 27, *with* Pl. 56.1 St. ¶ 27.

The titles of Allen's articles are "Hunting with a Microphone the Voices of Vanishing Birds," "Stalking Birds with a Color Camera," "Ambassadors of Goodwill," "Birds on the Home Front," "Touring for Birds with Microphone and Color Cameras," "Sights and Sounds of the Winged World," "A New Light Dawns on Bird Photography," "Birds of Timberline and Tundra," "Sea Bird Cities Off Audobon's Labrador," "The Curlew's Secret," "Voices of the Night," "The Bird's Year," "Duck Hunting with a Color Camera," "Split Seconds in the Lives of Birds," and "Sapsucker Woods."

### David Allen

David Allen is Arthur Allen's son and successor in interest and owns a business through which he licenses photographs to third parties. He contributed photographs to some of the articles referred to above, including The Curlew's Secret, Voices of the Night, Split Seconds in the Lives of Birds, and Sapsucker Woods. Further, he created photographs for the "The Quetzal," published in January 1969.[29] In connection with The Quetzal assignment, David Allen was paid a minimum guarantee of $2,000 for photographing the story, and NGS provided him with film and processing, reimbursed him for expenses incurred in writing and photographing it, and paid for required special equipment.[30]

David Allen submitted an application for registration to the Copyright Office sometime in 2000. Because the application was clumsily worded, the Office sought clarification of the nature of the claim by letter dated December 14, 2000.[31] The examiner advised plaintiffs' counsel that the Copyright Office could not register the individual photographs and text because they had been published with only the copyright notice of NGS.[32] He indicated that Allen could register a compilation claim, although he made clear that such a registration "would apply only to the particular arrangements and not to other arrangements of the same photos. Nor would the claims apply to the photos themselves."[33] Eventually, Mr. Allen registered a "compilation of photographs and text previously published in various issues of [the *Magazine* ]."[34] He entitled it "Volumes I and II of David Allen's Collection of National Geographics 1937–1989" and designated himself as the author of the compilation.[35] Thus, although the Copyright Office never formally denied registration of the individual photographs and text, it steered plaintiffs' counsel away from this type of claim and toward the compilation claim.

Although the Copyright Office registered Allen's compilation claim, plaintiffs' counsel included Mr. Allen's compilation in the notice of these infringement suits sent to the Copyright Office on January 29, 2001. The schedule labeled "Denied Copyright Applications for Compilations" included "David Allen's Collection of National Geographic's 1937–1989" although registration for this compilation had not been denied.[36]

### David Hiser

David Hiser is a professional photographer who photographed numerous stories published in the *Magazine* [37] including "Death Valley," published in January 1970, "Pacific Crest Trail," published in June 1971, "Missouri River," published in September 1971, "Stalking Wild Foods on a Desert Isle," published in July 1972, "West's Wild Foods," published in August 1973, "Lost Sierra,", published in September 1973, "The Lone Coyote," published in August 1974, "Texas," published in April 1976, "Hawaii," published in April 1976,

---

29. David Allen created photographs for at least two other stories, "Wildlife of a Verdant Land," and "Our National Wildlife Refuges: A Chance to Grow." However, defendants do not address these stories in their motion papers. Accordingly, they are not subject to this motion. *See* Def. Mem. 3 & App. A.

30. *Compare* Def. 56.1 St. ¶ 30, *with* Pl. 56.1 St. ¶ 30.

31. Def.App. Ex. A–10.

32. *See id.* at 1.

33. *See id.* at 2.

34. Pl.Ex. Opp. I, at B. 61–62.

35. *Id.* at B. 61.

36. *Id.* at B. 21–22.

37. Pl. 56.1 St. ¶ 35.

"The Tarahumaras," published in May 1976, and "Maine," published in June 1977.[38]

Hiser photographed all of these stories on assignment for NGS, which paid him for each and reimbursed him for expenses.[39] The assignments were confirmed in writing, and NGS obtained "publication rights" to the photographs for the Death Valley, Missouri River, and Pacific Crest Trail stories.[40] A letter dated September 23, 1969 regarding the Death Valley article states that "the photographs ... are being purchased for use in connection with the Death Valley article, and for other publications and purposes related to the National Geographic Society's objectives."[41] Letter agreements between NGS and Hiser grant NGS "all rights" in the photographs for the Stalking Wild Foods on a Desert Isle, Lost Sierra, and West's Wild Foods projects, although plaintiffs contend vehemently that this language relates to publication rights rather than copyrights.[42] The contract for The Lone Coyote story provided that NGS obtained the right to publish the photographs in the *Magazine* and for "further use in [NGS's] other publications and for any other purpose directly or indirectly related to, and in furtherance of the Society's objectives.

Such further use will be paid for at standard [NGS] rates."[43] Hiser produced several letters showing that NGS paid him for subsequent use of his photographs for the Missouri River,[44] Lone Coyote,[45] and Pacific Crest Trail[46] stories.

Hiser's registration attempts essentially mirrored those of David Allen, in large part because plaintiffs' counsel tried to register the claims of Hiser, Allen, and David Robert Austen on one form.[47] Eventually, Hiser registered a "[c]ompilation ... of photographs [p]reviously published in various issues of [the *Magazine*]."[48] He entitled it "Hiser Volumes I, II, III. David Hiser's Collection of National Geographic Photographs."[49]

Plaintiffs' counsel included Hiser in the Section 411(a) notice sent to the Copyright Office on January 29, 2001. On the schedule labeled "Denied Copyright Applications for Compilations," he included "David Hiser's Collection of National Geographic Photographs (Vols. I, II & III)," although registration for this compilation had not been denied.[50]

*The Jacobsons and Pamela Wilson Sartorelli*

Dr. Doranne Jacobson is a self-employed anthropologist who wrote and photo-

---

**38.** Def. Mem.App. C. The titles used here are not necessarily the exact titles that appeared in the *Magazine*. The Court uses these for the sake of convenience.

**39.** Pl. 56.1 St. ¶ 36.

**40.** *Compare* Def. 56.1 St. ¶ 37, *with* Pl. 56.1 St. ¶ 37.

**41.** Def.App. Ex. E–3.

**42.** *Compare* Def. 56.1 St. ¶ 38, *with* Pl. 56.1 St. ¶ 38; *see also* Def.App. Exs. H–1, J, I. The parties refer to "Wild Foods of Maine" in paragraph 38 of their 56.1 statements, but it is clear from the motion papers that this refers to what the Court is calling "Stalking Wild Foods on a Desert Isle."

**43.** *Compare* Def. 56.1 St. ¶ 39, *with* Pl. 56.1 St. ¶ 39; *see also* Def.App. Ex. K.

**44.** Pl.Ex. Opp, I, at B. 41, 43, 44.

**45.** *Id.* at B. 48.

**46.** *Id.* at B. 46.

**47.** *See* Def.App. Ex. A–10.

**48.** Pl.Ex. Opp. I, at B. 36–37.

**49.** *Id.* at B. 36.

**50.** *Id.* B. 21–22.

graphed an article entitled "Purdah in India: Life Behind the Veil" ("Purdah") on assignment for the *Magazine*.[51] NGS paid her a minimum guarantee of $1,000 for the photographs and $2,000 for the text and reimbursed her for certain expenses she incurred in connection with the story.[52] A letter from NGS to Dr. Jacobson on June 1, 1973 states that NGS will retain "all publication rights to published photographs."[53] An April 11, 1977 payment voucher from NGS states that "payment includes authority for further use of the photographs in [NGS's] other publications and for any other purpose directly or indirectly related to, and in furtherance of [NGS's] objectives. Such further use will be paid for at standard NGS rates ...."[54]

In 1985, Suzanne Dupré, corporate counsel for NGS, wrote to Ronald Harris of Hemphill Harris Travel Corporation ("Hemphill Harris") regarding Hemphill Harris's use in a travel brochure of a painting made from one of Dr. Jacobson's Purdah photographs.[55] She requested that Hemphill Harris pay Dr. Jacobson $2,000 for its unauthorized use of the photograph, which it did.[56]

On May 24, 1993, Dr. Jacobson wrote to Mrs. Mary Smith at NGS regarding the possible use of one of the Purdah photographs (with Dr. Jacobson's permission) on the cover of "an academic press book":[57]

"In the past, some photographs from my August, 1977, article have been used in publications, always with your permission and the understanding that the photographs would be run with the National Geographic copyright and credit. Since I was not a staff photographer, the fee for use of the photos have always been paid in their entirety to me. This particular photograph has been used by UNICEF a few times, and I have always received the full fee."

"I have a reproduction-quality duplicate of the photograph in question and would be happy to allow the University of Chicago Press to use this duplicate. However, I understand from Mr. Bill Perry that there is now a new policy in effect that would allow the Geographic to take 50% of the reproduction fee. I would very much appreciate it if you could inquire about the possibility of waiving this 50% share, in view of the fact that there is a long-standing precedent for the use of my photographs without such a share, and that there would be no expense to the Geographic, since I can provide a transparency for the Press to use."[58]

In a subsequent letter, Dr. Jacobson acquiesced in the 50 percent arrangement, but requested that she be paid 100 percent for uses negotiated before the 50 percent policy was put in place.[59]

Jerome Jacobson is Dr. Jacobson's husband. In connection with her Purdah coverage, Dr. Jacobson asked Jerome to photograph a traditional Indian wedding procession involving the groom because women were not permitted to attend such events. One photograph taken by Jerome was published in the *Magazine*. There was no communication between Jerome

**51.** Pl. 56.1 St. ¶ 40.

**52.** *Compare* Def. 56.1 St. ¶ 41, *with* Pl. 56.1 St. ¶ 41.

**53.** P.Ex. Opp. I, at B. 107.

**54.** *Id.* at B. 112.

**55.** *Id.* at B. 116–18.

**56.** *Id.* at B. 119–20.

**57.** *Id.* at B. 122.

**58.** *Id.*

**59.** *Id.* at B. 123.

and NGS with respect to the publication of this photograph.[60]

Pamela Wilson Sartorelli is Dr. Jacobson's sister. In connection with her Purdah coverage, Dr. Jacobson asked Sartorelli to take a photograph of her interacting with Indian village women. One such photograph taken by Sartorelli was published in the *Magazine.* An April 11, 1977 payment voucher sent to Sartorelli by NGS states that "[t]his payment includes authority for further use of the photograph in [NGS's] other publications and for any other purposes directly or indirectly related to, and in furtherance of [NGS's] objectives. Such further use will be paid for at standard NGS rates ...."[61]

Sometime in 2000, plaintiffs' counsel attempted to register copyright claims of the Jacobsons and Sartorelli to the photographs and text in the Purdah article. Initially, the Copyright Office refused registration because the photographs and text were published with only the copyright notice of NGS.[62] However, the Office advised plaintiffs' counsel that the contributions might be protected by NGS's notice for the *Magazine* as a whole and suggested renewal registration as a possibility.[63] Plaintiffs' counsel then attempted to register a "compilation of photographs and text previously published in *National Geographic.*"[64] The Copyright Office refused registration of this "compilation" on grounds that it was essentially identical to the photographs and text which The Ja-

cobsons and Sartorelli had sought to register previously.[65] Plaintiffs' counsel referred to The Jacobsons and Sartorelli in his January 29, 2001 notice to the Copyright Office pursuant to Section 411(a). On the schedule entitled "Denied Copyright Applications for Compilations (Copies Attached)," he listed "Pamela Wilson Sartorelli: 'Life in India,'" "Jerome Jacobson: 'India Behind the Veil (pp. 1734–1735),'" and "Doranne Wilson Jacobson: 'Life in India Behind the Veil.'"[66]

*Discussion*

### I. Summary Judgment

The summary judgment standard applied by the Court on this motion is set forth in the Court's opinion of even date in *Ward* and will not be repeated here.

### II. Copyright Infringement

■ To make out a claim for copyright infringement, a plaintiff must establish (1) ownership of a valid copyright, and (2) copying.[67] In this motion, defendants raise arguments attacking primarily plaintiffs' ownership of valid copyrights.

#### A. Registration Defects

Defendants maintain that plaintiffs lack valid registrations for their alleged copyrights for any of three reasons and that they therefore cannot maintain this action. First, they contend that plaintiffs must resort to a mandamus action to compel registration before this case can

---

60. Pl. 56.1 St. ¶ 43.

61. Pl.Ex. Opp. I, at B. 157.

62. *Id.* at B. 125.

63. *Id.*

64. *Id.* at B. 127.

65. *Id.*

66. *Id.* at B. 22.

67. 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.01, at 13–5 & n. 5 (2001) [hereinafter NIMMER] (citing *Reyher v. Children's Television Workshop,* 533 F.2d 87 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)).

proceed.[68] Second, they argue that, even if a mandamus action were not required, plaintiffs must establish that the Copyright Office [69] abused its discretion in denying registration in order to proceed with their infringement suit.[70] Finally, defendants appear to argue that plaintiffs cannot proceed with their infringement action with respect to works that are registered as compilations because those registrations protect only "the original elements of selection, coordination and arrangement of the compilations, not the individual images." [71] None of these arguments has merit.

■ Defendants' first argument is untenable in the face of Section 411(a) of the 1976 Act.[72] Plaintiffs served the Register of Copyrights with notice of these lawsuits and a copy of the complaints.[73] Despite irregularities in plaintiffs' notice to the Copyright Office, defendants raise no issue regarding the adequacy of this notice or other filing formalities. Accordingly, a mandamus action is not required.[74]

68. Def. Mem. 8.

69. The terms "Copyright Office" and "Register of Copyrights" are used interchangeably throughout this opinion.

70. Def. Reply Mem. 1.

71. *Id.*

72. *See Ward,* 208 F.Supp.2d at 444 n. 93.

73. Pl.Ex. Opp. 1, at B. 21–22.

74. *Ward,* 208 F.Supp.2d at ——.

75. *See* Part II.C of the opinion of even date in *Ward,* 208 F.Supp. at 443–448.

76. 17 U.S.C. § 410(c).

77. *Carol Barnhart Inc. v. Economy Cover Corp.,* 773 F.2d 411, 414 (2d Cir.1985). Because the issue of copyright ownership here

■ Defendants' second argument fails as well. For the reasons set forth in the Court's opinion of even date in *Ward,* when a plaintiff proceeds under Section 411(a), the district court makes an independent determination of copyright ownership, just as in any other infringement action.[75] In this determination of copyright ownership, the Copyright Office's refusal to register a work at most deprives the plaintiff of Section 410(c)'s presumption of validity,[76] which is not conclusive on the district court in any case.[77] Accordingly, plaintiffs may proceed with their infringement suit under Section 411(a) despite the Copyright Office's refusal to register certain of their works and without establishing that the Copyright Office's determination was erroneous.

In light of the foregoing, defendants' third argument requires little additional discussion. As an initial matter, defendants are correct that copyright protection for a compilation of preexisting work is different from copyright protection for one of the preexisting works. Section 103 of the 1976 Act states:

will depend primarily on resolution of the work-for-hire question, the notice issue raised in the rejection letters from the Copyright Office does not have any particular bearing on the outcome of this case. Accordingly, the complex issue of registerability under the 1909 Act would burden the Court's resources for little or no reason. Plaintiffs' counsel's request, in his letter to the Court on June 5, 2001, that the Court "level the playing field and grant [Faulkner] the registration," was premised on a misunderstanding of the law. Plaintiffs' counsel apparently credited the defendants' assertion that plaintiffs could not proceed under Section 411 without establishing that the Copyright Office's denial of registration was erroneous. What the complaint seeks relief for is copyright infringement, not denial of registration. The Court can determine the infringement issue without regard to the registration issue. Thus, the Court will not address specifically the registerability of plaintiffs' works.

"The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material." [78]

Thus it would seem that registration of a compilation made up of certain preexisting works is no substitute for registration of those preexisting works.[79] Defendants' argument crumbles, however, because the registration issue is immaterial to this Court's independent determination of copyright ownership under Section 411(a).[80]

In sum, none of defendants' arguments regarding registration defects justifies summary judgment against any of the plaintiffs on their copyright infringement claims.

## B. Failure to Renew as to Works Published Before 1964

■ Defendants argue that they are entitled to summary judgment dismissing all infringement claims relating to Arthur Allen's stories in the *Magazine* because they were published before 1964, and neither David nor Arthur Allen applied for initial or renewal registration with respect to these works. They are right.

Under the 1909 Act, which applies for purposes of determining duration of copyright to works that first were published prior to January 1, 1964, an author was entitled to an initial twenty-eight year copyright term, which expired unless the copyright was renewed by the author or his statutory successors during the final year of the initial term.[81] Failure to make a renewal application during the twenty-eighth year resulted in the work entering the public domain.[82] The rule was (and for

---

**78.** 17 U.S.C. § 103(b).

**79.** *See Morris v. Bus. Concepts, Inc.,* 259 F.3d 65, 71 (2d Cir.2001), *clarified on rehearing on other grounds,* 283 F.3d 502 (2d Cir.2002). The *Morris* court held that "[u]nless the copyright owner of a collective work also owns all the rights in a constituent part, a collective work registration will not extend to the constituent part." *Id.* The Court cannot assume that Allen and Hiser own all the rights in the constituent parts of their compilations, because that is precisely the question to be determined by these lawsuits.

**80.** The Court finds it immaterial that the Copyright Office never formally refused registration of the photographs and texts of Allen and Hiser. The examiner indicated to plaintiffs' counsel that pursuit of registration of the photographs and texts themselves would be fruitless. *See* Def.App. Ex. A–10. Thus, there was what might be called a *de facto* denial of registration. Plaintiffs' counsel included reference to Allen and Hiser in his notice to the Copyright Office regarding these lawsuits, and the attached complaints must have made

clear that their claims related to the photographs and text themselves, not the compilations. Allen and Hiser therefore may invoke Section 411(a) and proceed with their infringement suits despite the technical irregularities in their registration efforts.

**81.** *Religious Tech. Ctr. v. Netcom On–Line Communication Servs., Inc.,* 923 F.Supp. 1231, 1241 (N.D.Cal.1995); *accord Twin Books Corp. v. Walt Disney Co.,* 877 F.Supp. 496, 498–99 (N.D.Cal.1995), *rev'd on other grounds,* 83 F.3d 1162 (9th Cir.1996); *Int'l Film Exchange, Ltd. v. Corinth Films, Inc.,* 621 F.Supp. 631, 634–35 (S.D.N.Y.1985); 3 NIMMER § 9.05[B][1], at 9–44.

**82.** 3 NIMMER § 9.05[B][1], at 9–44.

The 1976 Act came into effect on January 1, 1978, but retained the renewal system for works that were copyrighted before 1978 and still were in their first terms on January 1, 1978. For these works, the statute provides for a first term of copyright protection lasting for twenty-eight years, with the possibility of a

our purposes, is) undeniably strict.[83]

It is undisputed that neither David nor Arthur Allen applied for renewal registration with respect to the works in the Arthur Allen stories published before January 1, 1964. Plaintiffs argue, however, that because NGS obtained initial and renewal registration for these works, they have been saved from the public domain by virtue of the Second Circuit's opinion in *Goodis v. United Artists Television, Inc.*[84] The issue thus joined is whether NGS's renewal registration prevented these works from falling into the public domain at the end of the initial copyright term if Arthur Allen and not NGS[85] owned the copyrights.

Plaintiffs' argument that Arthur and David Allen simultaneously may claim copyright ownership and rely on NGS's renewal ignores a line of cases standing for the proposition that renewal registration by the wrong party is void, and subsequent ratification by the party entitled to renew cannot revive it.[86] In the case most closely on point, *Tobani v. Carl Fischer, Inc.*,[87] a dispute arose between the children of a composer and his past employer, a music publishing company. Eleven years after the composer's employment ceased, in return for $25 per week for life and a lump sum payment of $5,000 upon his death, he "acknowledged that these works [at issue] were prepared by him pursuant to and in furtherance of his employment and he conveyed to his employer all such works, the copyrights therein and the right to apply for renewals."[88] After his death, his son caused renewals to be registered in his own name and brought suit on behalf of himself and his siblings.[89] The employer failed to apply for renewal registration.

---

second term of forty-seven years. In 1992, Congress amended the 1976 Act to make renewal of this second term automatic for works copyrighted between January 1, 1964, and December 31, 1977, leaving works copyrighted prior to January 1, 1964 subject to the old regime. *See Peer Int'l Corp. v. Latin Am. Music Corp.*, 161 F.Supp.2d 38, 49–50 (D.P.R. 2001); 3 NIMMER § 9.05[A][1], at 9–40.

**83.** *See* 3 NIMMER § 9.05[B][1], at 9–44 ("It has been held that a variance of even several days is fatal and that the purported renewal is void to rescue the subject work from the public domain, whether filed after expiration of the one year or prior to its initiation.").

**84.** 425 F.2d 397 (2d Cir.1970); *see* Pl. Mem. 15.

**85.** If NGS in fact owned the copyrights in these works, then its initial and renewal registration clearly saved these works from falling into the public domain. Plaintiffs, of course, cannot rely on this argument.

**86.** *Tobani v. Carl Fischer, Inc.*, 98 F.2d 57, 60 (2d Cir.), *cert. denied*, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1938); *Urantia Found. v. Maaherra*, 114 F.3d 955, 962 (9th Cir.1997); *Corinth Films, Inc.*, 621 F.Supp. at 635; *Von* *Tilzer v. Jerry Vogel Music Co.*, 53 F.Supp. 191, 196 (S.D.N.Y.1943), *aff'd sub nom. Gumm v. Jerry Vogel Music Co.*, 158 F.2d 516 (2d Cir.1946); 3 NIMMER § 9.05[D][1], at 9–85. As Nimmer notes, the Second Circuit cast some doubt on this line of cases in *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941 (2d Cir.1975). The court criticized the *Von Tilzer* case, and stated that a renewal claimed by one not entitled to it "may be held in trust for the benefit of the persons who are rightfully entitled thereto." *Id.* at 948. However, "[t]he *Bartok* court suggests some doubt as to its own ruling by further insulating from forfeiture those renewals that, under its definition of 'posthumous works,' would have been claimed by an improper party, by making its definition applicable only to future and pending renewals." *See* 3 NIMMER § 9.05[D][1], at 9–85 n. 134; *see also Bartok*, 523 F.2d at 948. The *Bartok* court did not claim to overrule *Tobani*, but rather distinguished it as applying to a different factual context. *See id.* at 948.

**87.** 98 F.2d 57.

**88.** *See id.* at 58.

**89.** *Id.* at 59.

The Second Circuit held that the composer's children were not entitled to renewal because the works were created as works for hire.[90] It went further, however, and held that the son's renewal registrations were "void" and that "it does not follow ... that appellee [the publisher] can cure its failure to renew by compelling appellants [the composer's successors] to convey their registrations." [91] The district court's decree therefore was ·modified by striking out the direction to assign the renewals to the music publishing company.[92] In light of *Tobani*, plaintiffs' argument fails. If Arthur and David Allen, rather than NGS, in fact were entitled to renew, as they would have been under Section 24 of the 1909 Act if the works were not made for hire,[93] then NGS's renewal would be void and plaintiffs would have no power to ratify that defective renewal.

Nor is plaintiffs' invocation of *Goodis v. United Artists Television, Inc.*[94] persuasive. In an attempt to stretch *Goodis* to fit the facts of this case, plaintiffs mischaracterize it as a case about registration[95] rather than notice.[96] More importantly, the logic of *Goodis* does not apply to the Allens' failure to obtain renewal registration. The *Goodis* court sought to avoid the harsh forfeiture that might have occurred due to the confluence of the indivisibility doctrine and the notice requirements under the 1909 Act.[97] The court's language is worth quoting:

"Under the Copyright Act of 1831, an author or proprietor obtained copyright, before publication, by depositing a copy of the title of his work in the district court in the district of his domicile. Thus, had Goodis completed his novel before 1909 and made the required deposit, he would have obtained copyright in his own name before publication and would have been free to market his work to his best advantage, selling serial rights, dramatic rights, etc. at his pleasure, without jeopardizing his copyright. In several cases before 1909 harsh forfeitures resulted from technical failures to comply with the statute, even though there was little chance that the public might have been misled by the errors."

"In 1909, the Copyright Act was amended and the method of obtaining copyright simplified. Under the revised Act, an author or proprietor could secure statutory protection by actual publication of the work with notice in conformity with the Act. Although appellees characterize this change as irrelevant, we think it critical. Suddenly the author who might previously have obtained copyright before publication had to guard against any legal infirmity surrounding first publication which might throw his work into the public domain. One can understand the requirement that only an author or proprietor perfect copyright under the 1831 statute, since copyright had to be obtained before pub-

90. *Id.* at 59–60.

91. *Id.* at 60.

92. *Id.*

93. 17 U.S.C. § 24 (superseded).

94. 425 F.2d 397 (2d Cir. 1970).

95. *See* Pl. Mem. 15.

96. *See Goodis,* 425 F.2d at 399 ("We unanimously conclude that where a magazine has purchased the right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright *notice* in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor." (emphasis added)).

97. *See id.* at 400, 402.

lication and the author or proprietor was expected to have exclusive control over the work. After 1909, however, it was expected that first publication of the work, whether in magazine or book form, would be the means of obtaining copyright. To require full proprietorship by the initial publisher would too often provide a trap for the unwary author who had assumed the publisher would attend to copyrighting the work in his behalf." [98]

As this passage reveals, the *Goodis* court's concern was with the hazards facing an unwary author who had to depend on the actions of others—namely publication with proper notice—in order to obtain copyright protection. This concern is especially understandable considering a magazine publisher's potentially greater bargaining power *vis-a-vis* its authors.

Plaintiffs invoke *Goodis* to protect themselves from a failure to renew in the twenty-eighth year following publication, but the concerns underlying the *Goodis* opinion are not implicated in this situation. The *Goodis* plaintiff had to rely on the actions of his publisher in order to obtain copyright protection and, to that extent, was at its mercy. In contrast, the Allens needed no one but themselves to file a claim for renewal.[99] They faced no trap for the unwary—they simply failed to take even the most basic steps to protect the text and photographs for which they now claim to own the copyrights. While *Goodis* does stand for the general proposition that courts should avoid unnecessarily harsh forfeitures when possible, it is not a license for plaintiffs to sit on their hands for no apparent reason. Therefore, to the extent plaintiffs assert that the Allens own the copyrights in the Arthur Allen stories, NGS's renewal registration was not sufficient to keep these works from entering the public domain. To the extent that plaintiffs admit that NGS was entitled to renewal registration for these works by virtue of its copyright ownership, they have no claim for copyright infringement. Either way, defendants are entitled to summary judgment dismissing David Allen's copyright infringement claims regarding the Arthur Allen stories published before 1964.[99]

### C. Work For Hire

Defendants claim that David Allen, Hiser, the Jacobsons, and Sartorelli created their photographs and texts as works for hire and that NGS owns the copyright in those works, thus entitling defendants to judgment as a matter of law.[100] The applicable rule of law for work-for-hire issues

---

**98.** *Id.* at 401–02 (citations omitted).

**99.** *See* 3 NIMMER § 9.05[D][1], at 9–87 ("[A]n individual author may file a claim for renewal in his own name with respect to his prior contributions to periodicals, including newspapers, regardless of whether the original copyright was obtained by a separate copyright notice and registration in the name of such author, or simply by virtue of a general copyright notice in the name of the proprietor of the periodical issue as a whole."); *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1329 (9th Cir.2000), *cert. denied*, 531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001) (discussing how 1940 amendments to Section 24 of the 1909 Act deleted the previous separate registration requirement, "permitting individual authors to renew copyrights in periodical contributions even if the only initial copyright on the work existed by virtue of the publisher's blanket copyright").

**99.** Appendix E to defendants' memorandum of law lists the works the works for which David Allen's infringement claims are dismissed and denied. Def. Mem.App. E.

**100.** Def. Mem. 13. Defendants make no work-for-hire argument regarding Douglas Faulkner's work. *See id.* Ex. F.

under the 1909 Act is set forth in *Ward* [101] and will not be repeated here.

### 1. *David Allen*

Because all infringement claims relating to the Arthur Allen claims have been dismissed, only the Quetzal assignment remains for consideration. The December 27, 1967 letter to Mr. Allen from Robert Gilka, the director of photography at the time, clearly establishes that the instance and expense prongs are met for the Quetzal project.[102] A reasonable trier of fact could find only that NGS was the "motivating factor" behind the project[103] and paid Allen "a sum certain for his . . . work." [104]

■ Furthermore, there is no genuine issue of fact regarding satisfaction of the supervision prong. The supervision requirement is met when the employer takes the initiative in engaging the independent contractor and has the power to " 'accept, reject, or modify, [his or] her work.' " [105] Although defendants have not produced evidence that NGS had the power to control what was published in this specific

article, they have produced uncontroverted evidence that it was NGS's practice during the 1960's and 1970's to choose which photographs were published and to make substantial editorial revisions to textual submissions.[106] While Allen asserts that NGS did not "supervise the photography process," [107] *Picture Music* makes clear that lack of direct supervision during the actual creation of the work is immaterial if, as here, the hiring party took the initiative in engaging the independent contractor and had the power to accept, reject, or modify the work.[108] Thus, defendants' evidence on the supervision issue is uncontradicted.

■ Plaintiffs contend also that there is evidence sufficient to create an issue of fact regarding an agreement that Allen would retain copyright in his photographs for the Quetzal assignment, and the Court agrees. It is undisputed that the letter contract for this assignment makes no mention of copyright ownership.[109] Nor do plaintiffs contend that anyone at NGS orally agreed with Allen that he would retain copyright with respect to this specif-

---

101. 208 F.Supp.2d at ——.

102. Def.App. Ex. B.

103. *Playboy Enters., Inc. v. Dumas,* 53 F.3d 549, 554 (2d Cir.), *cert. denied,* 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995). Accordingly, the instance requirement is met.

104. *Id.* at 555. Thus, the expense prong is met.

105. *Id.* (quoting *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213, 1217 (2d Cir.), *cert denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972)).

106. *See, e.g.,* Def.App. Ex. E–2 (Hiser letter contract, setting out in more detail how the minimum guarantee works and specifying that some photographs will be chosen for publication and some will not, the latter being returned to photographer); *id.* Ex. L–2 (Jacobson letter contract, giving her detailed in-

structions on what NGS wanted to see in her article); Doranne Jacobson Dep. 30 (indicating that NGS told Dr. Jacobson: "This is how we take pictures at the Geographic. We take a lot of images. Don't be afraid to use film. We will be providing you with all the film you need").

107. Allen Aff. ¶ 10 (Pl.Ex. Opp.1).

108. *See Picture Music,* 457 F.2d at 1216–17.

109. Allen Aff. ¶ 10 (Pl Ex. Opp. 1) ("The terms of the contract clearly do not indicate a work-for-hire relationship, and specifically make no reference to transfer of copyright."). Allen attempts to invoke the lack of a clause relating to copyright in the May 21, 1965 letter agreement as evidence of NGS's "intention that my Father and I would retain the copyright." *Id.* This argument utterly misconstrues the nature of the presumption triggered by satisfaction of the instance, expense, and supervision requirements.

ic assignment. The question therefore is whether there is a genuine issue of fact regarding the existence of an implied-in-fact agreement between NGS and Allen that he would retain copyright.[110] As noted in *Ward*, an implied-in-fact agreement may be established through proof of industry custom.[111]

Allen's affidavit states in regard to the Quetzal assignment that "it is my understanding and Gilka's that I kept the copyright to my work."[112] But this is neither relevant nor admissible. First, the material issue is whether Gilka and Allen's conduct, viewed in light of industry custom, evidenced a tacit agreement that Allen would retain copyright, *not* his or Gilka's "understanding" of the situation.[113] Furthermore, this statement appears to be nothing but a legal conclusion, and is not admissible for that purpose. In any case, this statement provides no evidence from which a trier of fact could conclude anything about industry custom or the conduct of Messrs. Allen and Gilka conduct during their contractual dealings.

Allen relies also on the affidavit of Robert Gilka submitted in the *Ward* action and resubmitted by plaintiffs here.[114] It is undisputed that Gilka was the NGS representative who gave Allen the Quetzal project.[115] The strengths and shortcomings of this affidavit are discussed in detail in the *Ward* opinion,[116] and will not be repeated here. Suffice it to say that the Gilka affidavit is probative of a magazine industry custom during the relevant time period and of Gilka's tendency to have acted in accordance with that custom in his dealings with photographers. Plaintiffs submitted evidence tending to show that Allen was aware of the same industry custom referred to in the Gilka affidavit because of his and his father's long careers in the business.[117] Unlike the situation in the *Ward* case, however, the Gilka affidavit does not speak directly to the price paid to Allen for taking on the assignment and how that price relates to the rights issue.

Allen emphasizes that the Quetzal assignment letter makes no mention of copyright.[118] At first, his focus appears misguided because of the presumption that arises when an employer satisfies the instance, expense, and supervision requirements. However, Allen's invocation of the absence of any language regarding rights is more probative when viewed in conjunction with evidence suggesting that the industry custom was that one-time publication rights was the default rule.

█ While it is a close call, plaintiffs have adduced sufficient evidence to create an issue of fact regarding whether Messrs. Allen and Gilka tacitly agreed that Allen would retain copyright ownership of his

110. *See Ward*, 208 F.Supp.2d at 436 n. 31, —— text accompanying nn. 46–51.

111. *Id.* at —— & text accompanying nn. 48–49.

112. Allen Aff. ¶ 10 (Pl.Ex. Opp.1).

113. *See Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S.D.N.Y.1911), *aff'd*, 201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *see also Thomas v. Stone Container Corp.*, 922 F.Supp. 950, 957 (S.D.N.Y.1996) (when issue was whether defendant lacked special equipment used by INDT to perform the work in which plaintiff assisted, plaintiff's "understanding" that the defendant lacked this equipment was not relevant).

114. Pl. Mem. Ex. A.

115. *See* Def.App. Ex. B.

116. *See Ward*, 208 F.Supp.2d at —— & text accompanying nn. 58–62.

117. Allen Aff. ¶¶ 3–10 (Pl.Ex. Opp.1).

118. *Id.* ¶ 10.

Quetzal photographs in accordance with the alleged prevailing custom in the magazine industry at the time. Thus, summary judgment dismissing Allen's infringement claim regarding the Quetzal project is denied.

### 2. David Hiser

■ Plaintiffs' admissions in their Rule 56.1 Statement and the evidence of NGS's ability to accept, reject, or modify the work of freelance contributors are sufficient to satisfy the instance, expense, and supervision requirements for all of Hiser's assignments. Thus, the only question is whether plaintiffs have produced evidence sufficient to create a genuine issue of fact regarding the existence of an agreement that Hiser would retain copyright in his photographs. Because the evidence varies with the assignment, the Court must consider individual assignments or groups of assignments.

The letter agreements between NGS and Hiser for the Death Valley, Missouri River and Pacific Crest Trail assignments stated that NGS would retain "publication rights" to published photographs.[119] This language itself creates a genuine issue of fact regarding Hiser's retention of copyright ownership. The term "publication rights" at least arguably implies the existence of some further rights, including the copyright itself, to be retained by Hiser.[120]

Additionally, Hiser produced several letters showing that NGS paid him for subsequent use of his photographs for the Missouri River and Pacific Crest Trail stories.[121] A reasonable trier of fact might consider it strange that NGS would pay Hiser to reuse works that it already owned.[122] Thus, summary judgment dismissing Hiser's infringement claims for these three assignments is not appropriate.

Similarly, the language in the letter agreement for The Lone Coyote militates against summary judgment. The letter, dated June 25, 1974, states that NGS would retain six transparencies for publication and three as file selects. It then states:

> "All nine transparencies become the property of [NGS] for further use in the Society's other publications and for any other purposes directly or indirectly related to, and in furtherance of the Society's objectives. Such further use will be paid for at standard NGS rates, except that such payment for use in the National Geographic Magazine or any Society book shall include the right to use such photograph in the National Geographic School Bulletin or Explorers Hall displays without further compensation."[123]

The language of the letter does not point unmistakably towards either NGS or Hiser

---

119. Def. 56.1 St. ¶ 37.

120. *Cf. Sayers v. Rochester Tel. Corp.*, 7 F.3d 1091, 1094 (2d Cir.1993) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning. If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." (internal quotation marks and citations omitted)).

121. *See supra* notes 43, 45.

122. *Cf. Playboy Enters., Inc. v. Dumas*, 831 F.Supp. 295, 312 (S.D.N.Y.1993) ("An assignment would not make sense if the parties presumed that Playboy would be the author of the work for statutory purposes."), *aff'd in part and rev'd in part on other grounds*, 53 F.3d 549 (2d Cir.), *cert. denied*, 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995).

123. Def.App. Ex. K.

as the copyright owner of the photographs. To begin, the transparencies "become the property" of [NGS]. It is not clear, however, whether it is the physical objects, *i.e.*, the transparencies themselves, or the intellectual property rights in the photographs that "become the property" of NGS. Next, the letter states that NGS may use the photographs in the future, but requires it to pay for such use at standard rates. As noted above, a jury might consider it strange that NGS would pay Hiser to reuse works that it already owned.[124] Summary judgment dismissing Hiser's infringement claim for his photographs associated with this assignment therefore is not appropriate.

■ The situation is different for the Lost Sierra, West's Wild Foods, and Stalking Wild Foods on a Desert Isle assignments. Here, as plaintiffs admit in their Rule 56.1 Statement, letter agreements between NGS and Hiser granted NGS "all rights" in the published photographs for these projects.[125] Moreover, plaintiffs produced no evidence that NGS ever promised to pay or actually paid for reuse of the photographs associated with these stories. No reasonable trier of fact could find that the contracts in question reserved copyright to Mr. Hiser. In short, there is no genuine issue of fact regarding the photographs for these three assignments, and defendants are entitled to judgment as a matter of law.

As for the Texas, Hawaii, Tarahumaras, and Maine assignments, defendants simply point to deposition testimony that shows that the instance, expense, and supervision requirements are met.[126] This is not sufficient because there is an issue of fact regarding an agreement that Hiser would retain copyright.

Neither side produced evidence of any written agreements for these assignments. As did David Allen with respect to the Quetzal assignment, Hiser relies on Robert Gilka's affidavit from the *Ward* action and his own experience with and awareness of magazine industry custom to argue that the parties had an implied-in-fact agreement regarding copyright.[127] For the reasons discussed in relation to the Quetzal project, it would be premature to say that no reasonable trier of fact could conclude that Messrs. Hiser and Gilka tacitly agreed that Hiser would retain copyright in the photographs for these assignments. Summary judgment dismissing these claims therefore is denied.

### 3. The Jacobsons and Pamela Wilson Sartorelli

■ Assuming, without deciding, that defendants have satisfied the instance, expense, and supervision prongs for the Purdah article, plaintiffs have adduced evidence sufficient to create a genuine issue

---

**124.** Additionally, Hiser has produced evidence that NGS paid him for subsequent use of photographs originally appearing in The Lone Coyote story. *See supra* note 44. This contributes to the presence of a genuine issue of fact.

**125.** The Court is aware that language granting "all rights" does not necessarily or unambiguously transfer copyright ownership. *See Playboy Enters.*, 831 F.Supp. at 305. However, it must be remembered that defendants here enjoy the presumption resulting from their satisfaction of the instance, expense, and

supervision requirements. There is absolutely no ambiguity in the retention of "all rights" by NGS when it comes to deciding whether there was an express or implied agreement reserving copyright to Hiser.

**126.** Def. Mem.App. F; *see* Hiser Dep. 152–53, 154, 156, 158.

**127.** Hiser Aff. ¶¶ 2, 7 (Pl.Ex. Opp.1). It is undisputed that Mr. Hiser had most of his contractual dealings with NGS through Mr. Gilka. *See* Def.App. Exs. E–H.

of fact regarding an agreement that the Jacobsons and Ms. Sartorelli would retain copyright ownership in the works created for the article.

To begin with, the language in Dr. Jacobson's letter contract with NGS states that NGS will retain "all publication rights to published photographs." [128] As noted above, the term "publication rights" at least arguably implies the existence of some further rights, including the copyright itself, to be retained by Dr. Jacobson and her co-contributors. Next, NGS agreed to pay Dr. Jacobson for future use of the published photographs [129] and even enforced Dr. Jacobson's rights to payment for future use against third parties. [130] A reasonable trier of fact could interpret these actions as recognition on the part of NGS that Dr. Jacobson and her co-contributors had retained copyright ownership in their photographs. On the other hand, Dr. Jacobson's letter to Mary Smith at NGS provides strong evidence that Dr. Jacobson herself was aware that NGS retained copyright to the photographs for this article. She acknowledged that pictures previously were used with NGS's permission and "the understanding that the ˙photographs would be run with the [NGS] copyright." [131] She agreed also to split with NGS the payment she was to receive from a third-party publisher for such use. [132] With evidence pointing in both directions, as it does here, it is for the trier of fact to resolve the question whether there was an agreement that the contributors to the Purdah article would retain copyright in their works. Accordingly, defendants are not entitled to summary judgment dismissing the copyright infringement claims of the Jacobsons and Ms. Sartorelli.

### D. License to Publish Photographs and Texts in the Magazine

■ Defendants argue also that they would be entitled to summary judgment, even if the Pre–1978 Works were not works for hire, because plaintiffs granted NGS a license encompassing the creation and distribution of The Complete National Geographic. [133] The theory is that The Complete National Geographic is nothing more than "an exact image-based reproduction of issues of the Magazine in electronic format." [134]

For the reasons set out in *Ward*, the defendants' argument fails as a matter of law. Under the 1909 Act, NGS had no right to sublicense any rights it might have obtained from plaintiffs unless plaintiffs expressly permitted it to do so. [135] Because not even the letter contracts that defendants call the "unlimited licenses" expressly and unambiguously permitted sublicensing, and production and distribution of The Complete National Geographic occurred through a series of sublicensing arrangements, summary judgment for defendants on this ground is not appropriate.

---

128. P.Ex. Opp. I, at B. 107.

129. An April 11, 1977 payment voucher sent to Ms. Sartorelli stated that NGS would pay for future use of her photograph as well. Pl.Ex. Opp. I, at B. 157.

130. *See supra* text accompanying notes 54–55.

131. *Id.* at B. 122.

132. *See id.* at B. 122–23.

133. Def. Mem. 17.

134. *Id.* As noted above, plaintiff's dispute this assertion, arguing that the Complete National Geographic is not an exact replica of the *Magazine* because it does not reflect the differences in regional editions.

135. *See* Part II.B in *Ward,* 208 F.Supp.2d at 441–43.

### E. Kodak

■ Defendants argue also that the Court should dismiss plaintiffs' copyright infringement claims against Kodak. The Court agrees because plaintiffs have failed to adduce evidence sufficient to create a genuine issue of material fact regarding Kodak's liability for direct, vicarious, or contributory infringement.

### 1. Direct Infringement

Assuming for the sake of argument that plaintiffs own valid copyrights in the works at issue here, they have brought forward absolutely no evidence suggesting that Kodak itself engaged in conduct that violated any of the exclusive rights granted to copyright holders.[136] Plaintiffs do not point to any evidence indicating that Kodak publicly distributed the 5,000 complimentary units it received pursuant to the co-sponsorship agreement. Their conclusory assertion that the co-sponsorship agreement makes Kodak "the infringer best [sic] or at least . . . a joint infringer" is not supported by any evidence in the record. Accordingly, plaintiffs cannot hold Kodak liable as a direct infringer as a matter of law.

### 2. Vicarious Infringement

■ The concept of vicarious copyright liability was developed in the Second Circuit as an outgrowth of the agency principles of respondeat superior.[137] "[V]icarious liability extends beyond an employer/employee relationship to cases in which a defendant 'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" "Benefit and control are the signposts of vicarious liability."[138]

Plaintiffs have adduced no meaningful evidence that Kodak exercised any degree of control over the allegedly infringing activities.[139] The co-sponsorship agreement among Kodak, NGI, Mindscape and Dataware gave Kodak no supervisory authority over nor input into the production and distribution of The Complete National Geographic products.[140] Plaintiffs appar-

---

**136.** See A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir.2001) (two requirements of prima facie case of direct infringement are (1) ownership of allegedly infringed material and (2) violation by infringers of at least one of the exclusive rights granted to copyright holders).

**137.** See id. at 1022; accord Demetriades v. Kaufmann, 690 F.Supp. 289, 292 (S.D.N.Y. 1988).

**138.** See Demetriades, 690 F.Supp. at 293.

**139.** Cf., e.g., Rohauer v. Killiam Shows, Inc., 379 F.Supp. 723, 730 (S.D.N.Y.1974) ("A sponsor will be held liable for copyright infringement if it had the power to supervise and control the content of the programs."), rev'd on other grounds, 551 F.2d 484 (2d Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); Bevan v. Columbia Broad. Sys., Inc., 329 F.Supp. 601, 610–11 (S.D.N.Y.1971) (sponsor of infringing television program held not vicariously liable when their was no evidence that sponsor exercised contractual right to view and request alteration to teleplays prior to filming and infringing program was "primarily a network-packaged as opposed to sponsor-packaged production"); Davis v. E.I. DuPont de Nemours & Co., 240 F.Supp. 612, 631–32 (S.D.N.Y.1965) (sponsor of infringing television program held vicariously liable when sponsor had ultimate power to determine content of the program and exercised that power through its agent).

**140.** Judge Haight has written as follows about the nature of the requisite "control":

"[T]he formal relationship between parties is not the driving force behind liability; rather, the parties' paths must cross on a daily basis, and the character of this intersection must be such that the party against whom liability is sought is in a position to control the personnel and activities responsible for the direct infringement."

ently concede as much—they make no argument regarding vicarious infringement in their memorandum.[141] Kodak is not liable as a vicarious infringer.

### 3. Contributory Infringement

 Liability for contributory infringement arose out of the tort concept of enterprise liability.[142] "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."[143] In other words, the standard for contributory infringement has two prongs—the "knowledge" prong and the "material contribution" prong.[144] "Two types of activities that lead to contributory liability are: (i) personal conduct that encourages or assists the infringement; and (ii) provision of machinery or goods that facilitate the infringement."[145] This case involves only the former type of activity.

 As for the material contribution prong, "the alleged contributory infringer must have made more than a 'mere quantitative contribution' to the primary infringement": in other words, the participation or contribution must be "substantial."[146] "The authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer."[147]

 Defendants correctly point out that the mere purchase of advertising space for one's own non-infringing product through a vehicle that itself engages in unrelated infringement appears insufficient to establish material contribution.[148] The record indicates, however that Kodak did more than simply purchase advertising space on The Complete National Geographic. A reasonable trier of fact could conclude that Kodak actively promoted and advertised The Complete National Geographic itself.[149] Advertising or other-

*Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103, 1109 (S.D.N.Y.1994) (citing *Demetriades*, 690 F.Supp. at 292). While Judge Haight's observation that the parties' "paths must cross on a daily basis" perhaps should not be taken literally, especially in light of recent decisions involving Internet technology, the thrust of his statement—the notion that the control must be substantial and have practical force—remains sound. *See generally* Hon. Lewis A. Kaplan, *Copyright in the Digital Age*, 49 J. COPYRIGHT SOC'Y OF THE USA 1, 4–9 (2001) (discussing evolving standards of secondary liability in era of digital technology).

141. *See* Pl. Mem. 32–33.

142. *Demetriades*, 690 F.Supp. at 292.

143. *Gershwin Publ'g*, 443 F.2d at 1162; *accord Napster, Inc.*, 239 F.3d at 1019; *Matthew Bender*, 158 F.3d at 706; *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir.1984).

144. *See, e.g., Napster, Inc.*, 239 F.3d at 1020–1022; *Livnat v. Lavi*, No. 96 Civ. 4967(RWS), 1998 WL 43221, at *3 (S.D.N.Y. Feb.2, 1998)

(noting that "'knowledge and participation [are] the touchstones of contributory infringement'" (quoting *Demetriades*, 690 F.Supp. at 293)).

145. *Matthew Bender*, 158 F.3d at 706.

146. *Livnat*, 1998 WL 43221, at *4.

147. *Id.*

148. *See e.g., id.* ("Merely advertising in an issue [of a magazine] which carries an article containing infringing photographs cannot constitute a material contribution to that infringement."); *Davis*, 240 F.Supp. at 631 ("Something other than the mere relation of advertiser and station operator must exist to support an action against the advertising defendant for violation of the plaintiff's property rights by programs broadcast by the station." (internal quotation marks omitted)).

149. For instance, the co-sponsorship agreement provides that Kodak representatives would attend and speak about the product at

wise promoting an infringing product or service may be sufficient to satisfy the material contribution prong.[150] Thus, it is premature to say that plaintiffs cannot satisfy the material contribution prong.

The same cannot be said for the knowledge prong. "Knowledge of the infringing activity may be actual or constructive."[151] In other words, this prong is satisfied if the defendant "knew or should have known" of the infringing activity at the time of its material contribution.[152] Plaintiffs make two arguments in support of the proposition that Kodak had (at the inception of the co-sponsorship arrangement) and continues to have constructive knowledge that The Complete National Geographic products infringe the plaintiffs' copyrights in their images and text. Whether viewed independently or together, these arguments lack merit.

First, plaintiffs contend that Kodak was put on notice in 1997, when the first infringement claims were brought.[153] While it is clear Kodak has had actual knowledge

of adverse claims since 1997, it is not apparent that Kodak should have known from the existence of these claims that The Complete National Geographic products infringed plaintiffs' copyrights. As this opinion makes clear, to the extent plaintiffs' infringement claims have not been dismissed, disputed issues of fact remain regarding whether or not plaintiffs created their photographs and texts as works for hire for NGS. Because the work-for-hire issue requires resolution by a trier of fact, it is difficult to conclude that Kodak should have known simply from the fact of these lawsuits that plaintiffs owned the copyrights at issue. Plaintiffs' argument merely begs the question to be answered by the lawsuit.

The situation here is different from that found in the counterfeit music or software context, where courts have been willing to impute knowledge to defendants who have received cease-and-desist letters and other warnings.[154] In the piracy context, there

---

promotional media events, and that Kodak would promote the product and the sweepstakes on its website. *See* Fahey Decl. Ex. C. ¶¶ 1.c–1.e.

**150.** *See, e.g., Columbia Pictures,* 749 F.2d at 161 (holding co-defendant liable as contributory infringer when it conducted "all of the advertising and promotion work" for retail video store that publicly displayed copyrighted motion pictures); *Rogers v. Koons,* 751 F.Supp. 474, 481 (S.D.N.Y.1990) (concluding that art gallery's advertisement and display of infringing sculpture materially contributed to artist's infringing conduct), *amended,* 777 F.Supp. 1 (S.D.N.Y.1991), *aff'd,* 960 F.2d 301 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Screen Gems–Columbia Music, Inc. v. Mark–Fi Records, Inc.,* 256 F.Supp. 399, 401, 404 (S.D.N.Y.1966) (denying summary judgment with respect to advertising agency that received previously prepared advertising material for infringing product from primary infringer, purchased radio time for broadcast of advertising material, and received a com-

mission based on the fee charged by each radio station for the time purchased).

**151.** *Livnat,* 1998 WL 43221, at *3.

**152.** *E.g., R & R Recreation Prods., Inc. v. Joan Cook Inc.,* No. 91 Civ. 2589(JSM), 1992 WL 88171, at *3 (S.D.N.Y. Apr.14, 1992); *Screen Gems–Columbia Music, Inc.,* 256 F.Supp. at 403.

**153.** Pl. Mem. 32.

**154.** *E.g., Cherry Auction,* 76 F.3d at 261, 264 (concluding that plaintiff adequately alleged knowledge when police raided swap meet more than a year before lawsuit commenced, police sent letter to swap meet regarding counterfeit recordings, and swap meet proprietors did not cooperate with authorities); *Adobe Sys. Inc. v. Canus Prods., Inc.,* 173 F.Supp.2d 1044, 1056 (C.D.Cal.2001) (finding disputed issue of fact regarding knowledge when Adobe sent computer fair proprietor cease-and-desist letter and then distributed flyers at the fair warning that unauthorized Adobe products were being sold).

usually are clear indicators that an accused product is infringing, such as packaging and unusually low prices. Here, the question of infringement turns on complex analysis of contractual arrangements going back twenty years and more. In other words, plaintiffs' allegations of infringement are anything but readily verifiable, making Kodak's lack of knowledge regarding true copyright ownership objectively reasonable.[155] Moreover, common sense tells us that Kodak was entirely justified in leaving to NGS the primary role in dealing with the "rights issue." [156] The undisputed evidence shows that Kodak made a reasonable inquiry regarding the intellectual property rights of contributors and received satisfactory assurances from NGS.[157]

Second, plaintiffs make the following argument:

"Although William Gray, Manager of Corporate Branding for Kodak, testified that he called Robert Simms, Senior Vice President of NGS, because he had learned that there were some questions with regard to the 'rights issue' and was assured that NGS was confidant [*sic*] that there was no problem, Kodak probably didn't care if it was on solid ground, because they obtained an indemnification agreement from the new entity NGI; the warranty was that NGI owns or controls all rights to the materials contained in CD–108 which we now

know was false because they owned very little of the rights needed to proceed." [158]

Essentially, plaintiffs ask the Court to assume from the indemnification agreement that Kodak willfully or negligently blinded itself to plaintiff's ownership of the works.[159] This the Court will not do because Kodak's insistence on an indemnification provision was nothing but a prudent business tactic, and a reasonable trier of fact could not infer anything about Kodak's knowledge of infringing activity from its mere existence. Plaintiffs therefore may not hold Kodak liable as a contributory infringer as a matter of law.

## III. State Law Claims

Defendants argue that they are entitled to summary judgment dismissing all of plaintiffs' state law claims on grounds that they are preempted by Section 301 of the 1976 Act.[160] The Court agrees.

### A. Copyright Preemption in General

■ Section 301 provides for preemption of state law claims that seek to vindicate rights "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103." [161] Preemption is warranted if

---

155. *Cf., e.g., Netcom,* 907 F.Supp. at 1374 ("Where a BBS operator cannot reasonably verify a claim of infringement either because of a possible fair use defense, the lack of copyright notices on the copies, or the copyright holder's failure to provide the necessary documentation to show that there is a likely infringement, the operator's lack of knowledge will be found reasonable and there will be no liability for contributory infringement for allowing the continued distribution of the works on its system.").

156. Pl. Mem. 32.

157. Gray Dep., Def.App. Ex. N–4, at 60–61.

158. Pl. Mem. 32–33.

159. *See* Fahey Decl. Ex. C ¶ 10.

160. 17 U.S.C. § 301. By its terms, Section 301 applies to works created both before and after January 1, 1978. *Id.* § 301(a).

161. *Id.*

"(i) the state law claim seeks to vindicate 'legal or equitable rights that are equivalent' to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106—styled the 'general scope requirement'; and (ii) the particular work to which the state law claim is being applied falls within the type of works protected by the Copyright Act under Sections 102 and 103—styled the 'subject matter requirement.' "[162]

The photographs and texts at issue in this case fall indisputably within the ambit of copyright protection. The subject matter prong therefore is satisfied with respect to all of plaintiffs' state law claims.

The general scope requirement is satisfied "when the state law rights asserted by the plaintiff are equivalent to any of the exclusive rights within the scope of copyright law"[163] as provided by Section 106. Section 106 grants to the copyright owner the exclusive rights of reproduction, preparation of derivative works, distribution, performance, and display (including the right to authorize others to perform these actions).[164]

■■■ To determine whether the general scope requirement is met, courts apply what is known as the "extra element"

test. "[I]f an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie "within the general scope of copyright" and there is no preemption.' "[165] Stated differently, a state law claim "is not preempted if the 'extra element' changes the 'nature of the action so that it is *qualitatively different* from a copyright infringement claim.' "[166]

## B. Unjust Enrichment

Plaintiffs' third cause of action is an unjust enrichment claim against NGS, alleging that NGS "obtained benefits as a result of improperly using plaintiffs' rights, which rights defendant was not authorized to use, and for which it did not compensate plaintiff."[167] Though couched in terms of obtaining a "benefit," the essence of plaintiffs' unjust enrichment claim is simply that NGS is and has been exploiting rights that allegedly belong to plaintiffs by virtue of their authorship—in other words, exploiting and thus infringing rights that are those of a copyright holder.[168]

■■■ While "[t]he overwhelming majority of courts in this circuit have held that an unjust enrichment claim based upon the copying of subject matter within the scope

**162.** *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 848 (2d Cir.1997) (quoting 17 U.S.C. § 301); *accord Archie Comic Pubs., Inc. v. DeCarlo,* 141 F.Supp.2d 428, 431 (S.D.N.Y.), *aff'd,* 11 Fed. Appx. 26 (2d Cir. 2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 647, 151 L.Ed.2d 564 (2001).

**163.** *Am. Movie Classics Co. v. Turner Entm't Co.,* 922 F.Supp. 926, 930 (S.D.N.Y.1996).

**164.** 17 U.S.C. § 106.

**165.** *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir.1992) (quoting NIMMER § 1.01[B][1] ); *see, e.g., Archie Comic Pubs.,* 141 F.Supp.2d at 432.

**166.** *Computer Assocs.,* 982 F.2d at 716 (emphasis in original) (quoting *Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1535 (S.D.N.Y.1985)); *accord Wharton v. Columbia Pictures Indus.,* 907 F.Supp. 144, 145 (D.Md.1995) (quoting *Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 230 (4th Cir.1993)).

**167.** Second Am. Cpt. ¶ 70 (97 Civ. 9361(LAK)) ("Faulkner Cpt."); Second Am. Cpt. ¶ 86 (99 Civ. 12488(LAK)) ("Hiser Cpt.").

**168.** *See, e.g., Archie Comic Pubs.,* 141 F.Supp.2d at 432 (quoting *Computer Assocs.,* 982 F.2d at 716).

of the Copyright Act is preempted," [169] some courts have held that such a claim is not preempted because the defendant's acceptance of the benefit of the copyrighted work provides an extra element.[170] But "an infringer always 'accepts' the benefit of the copyrighted work." [171] In other words, these courts take the "extra element" test too literally and ignore the principle that the state law claim at issue must be "qualitatively different" in order to avoid preemption. Here, plaintiffs do not contend that defendants were enriched by anything other than their unauthorized reproduction, distribution, and creation of derivative works from the plaintiffs' images and text.[172] At bottom, plaintiffs' unjust enrichment claim is not qualitatively different from a copyright infringement claim and therefore is preempted by Section 301. Summary judgment dismissing this claim therefore is granted.

### C. Common Law Unfair Competition

██ Plaintiffs' fourth cause of action is for common law unfair competition against all defendants. It is well-settled that "state law claims that rely on the misappropriation branch of unfair competition are preempted." [173] In *Warner Brothers Inc. v. American Broadcasting Companies, Inc.*, however, the Second Circuit carved out an exception for state unfair competition claims that allege the tort of passing off.[174] Picking up on this exception, plaintiffs couch their unfair competition claim in the following terms: "Defendants infringed plaintiffs' rights, by exploiting the aforesaid property, in their effort to 'palm off' plaintiffs' works as theirs claiming copyright." [175] Essentially, plaintiffs contend that defendants have engaged in "reverse palming off" by misrepresenting NGS as the creator of the Pre–1978 works.[176] They claim that defendants have done so by registering The Complete National Geographic with the Copyright Office, "stating that '*All Rights Are Reserved*,' and adding a new copyright claim to each page of the new product without specifically reserving the

169. *Cooper v. Sony Records Int'l*, No. 00 Civ. 233(RMB), 2001 WL 1223492, at *4 (S.D.N.Y. Oct.15, 2001) (quoting *Boyle v. Stephens Inc.*, No. 97 Civ. 1351(SAS), 1998 WL 690816, at *6 (S.D.N.Y. Sept.29, 1998) (collecting cases), *aff'd*, 21 Fed. Appx. 76 (2d Cir.2001)).

170. *E.g., Universal City Studios, Inc. v. Nintendo Co.*, 615 F.Supp. 838, 856–57 (S.D.N.Y. 1985), *aff'd on other grounds*, 797 F.2d 70 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Schuchart & Assocs. v. Solo Serve Corp.*, 540 F.Supp. 928, 945 (W.D.Tex.1982).

171. 1 NIMMER § 1.01[B][1][h], at 1–39.

172. *See, e.g., Markogianis v. Burger King Corp.*, No. 95 Civ. 4627, 1997 WL 167113, at *6 (S.D.N.Y. Apr.8, 1997) ("Plaintiffs do not allege that BKC was enriched from anything other than BKC's unauthorized use of Plaintiffs' protected marketing concept. As there is no difference in the relief claimed under state law and that provided by the federal

copyright law, the Court holds that the state claim of unjust enrichment is preempted." (citation omitted)).

173. *Warner Bros. Inc. v. Am. Broad. Co., Inc.*, 720 F.2d 231, 247 (2d Cir.1983).

174. *Id.*

175. Faulkner Cpt. ¶ 72; Hiser Cpt. ¶ 88.

176. *See, e.g., Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780–81 (2d Cir.1994) (defining reverse palming off for purposes of Section 43(a) of the Lanham Act as "the misappropriation of credit properly belonging to the original creator"); *Kregos v. Associated Press*, 795 F.Supp. 1325, 1336 (S.D.N.Y.1992) (explaining that standards for Section 43(a) claims under the Lanham Act and unfair competition claims under New York law are virtually the same), *aff'd*, 3 F.3d 656 (2d Cir.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994).

plaintiff's rights, or giving proper visible attribution." [177]

■ What plaintiffs fail to recognize is that the exception for "passing off" recognized in *Warner Brothers, Inc.* itself has an exception—an exception to the exception so to speak. The Second Circuit has held expressly and repeatedly that, as a matter of law, "a false copyright notice alone cannot constitute a false designation of origin within the meaning of § 43(a) of the Lanham Act." [178] The rational for this rule is that "[w]ithout a requirement of 'some additional misrepresentation of originality beyond mere use of a copyright symbol, [plaintiffs] could convert all improper copyright claims into Lanham Act violations.' " [179] This rationale applies with equal force to common law false designation of origin claims, especially considering that "the standards for § 43(a) claims under the Lanham Act and unfair competition claims under New York law are virtually the same." [180] In either case, there is no misrepresentation of origin that does not reduce ultimately to unauthorized exploitation of rights that allegedly belong to the true copyright holder.

■ Plaintiffs' common law unfair competition claim is preempted because it alleges nothing other than false designation of origin through improper use of copyright notice. Summary judgment dismissing this claim therefore is granted.

### C. Tortious Misappropriation of Goodwill

■ Plaintiffs' fifth cause of action is for tortious misappropriation of goodwill by all defendants and alleges that defendants "have usurped, for their own commercial advantage, the unique elements and features of plaintiffs' copyrighted images and text." [181] They further allege that defendants' "conduct is specifically designed to trade upon the phenomenal popularity and goodwill of plaintiffs' valuable images and text." [182]

This claim merely restates the allegations in plaintiffs' copyright claim, which in turn were restated in the unfair competition claim. The "conduct" alleged is nothing other than unauthorized reproduction and distribution of the Pre–1978 Works. Plaintiffs identify nothing that makes this claim qualitatively different from their copyright infringement claims. [183] Accordingly, this claim is preempted by Section 301 and summary judgment dismissing it is granted.

### Conclusion

Defendants' motion for partial summary judgment dismissing plaintiffs' claims with respect to the Pre–1978 Works is disposed of as follows:

1. It is granted in all respects, and all claims involving the Pre–1978 Works are dismissed, as to defendant Kodak.

**177.** Faulkner Cpt. ¶ 73; Hiser Cpt. ¶ 89.

**178.** *Lipton v. Nature Co.,* 71 F.3d 464, 473 (2d Cir.1995); *accord Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.,* 118 F.3d 955, 970–71 (2d Cir.1997), *cert. denied,* 523 U.S. 1020, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *EFS Marketing, Inc. v. Russ Berrie & Co., Inc.,* 76 F.3d 487, 492 (2d Cir.1996); *Kregos v. Associated Press,* 937 F.2d 700, 711 (2d Cir.1991).

**179.** *Softel,* 118 F.3d at 971 (quoting *EFS Marketing, Inc.,* 76 F.3d at 492).

**180.** *Kregos,* 795 F.Supp. at 1336; *accord Marvullo v. Gruner & Jahr AG & Co.,* No. 98 Civ. 5000(RLC), 2001 WL 40772, at *7 (S.D.N.Y. Jan.17, 2001).

**181.** Faulkner Cpt. ¶ 83; Hiser Cpt. ¶ 99.

**182.** Faulkner Cpt. ¶ 84; Hiser Cpt. ¶ 100.

**183.** *E.g., Marvullo,* 2001 WL 40772, at *8 (dismissing tortious misappropriation of goodwill claim drafted by plaintiffs' counsel using identical language).

2. It is granted with respect to David Allen's copyright infringement claims regarding the Arthur Allen stories published before 1964, Davis Hiser's copyright infringement claims regarding the Lost Sierra, West's Wild Foods, and Stalking Wild Foods on a Desert Isle assignments, and all of plaintiffs' state law claims.

3. It is denied in all other respects.

SO ORDERED.